## LAPERLA, LTD. *v.* PEERLESS INSURANCE COMPANY

Superior Court, Judicial District of Hartford
File No. HHD-CV-05-4015463

---

Memorandum filed February 6, 2009

*Halloran & Sage, LLP*, for the plaintiff.

*Ouellette, DeGanis & Gallagher, LLC*, for the defendant.

BENTIVEGNA, J.

I

## STATEMENT OF CASE

This case involves an insurance coverage dispute. In the revised two count complaint, dated April 11, 2007, the plaintiff, LaPerla, Ltd., alleges that the defendant, Peerless Insurance Company, breached the insurance contract and the implied covenant of good faith and fair dealing by failing to pay a loss claim under the "jewelers block coverage" provision of the policy.

On July 19, 2007, the defendant filed an answer and special defenses. In addition to denying the claims made by the plaintiff, the defendant has affirmatively asserted six special defenses: (1) collateral source; (2) setoff; (3) coverage limitations; (4) time barred claim; (5) exclusionary provision; and (6) failure to cooperate.

The matter was tried on November 12, 2008. The last posttrial brief was filed on January 23, 2009.

## II

## FINDINGS OF FACT

The following facts were proved at trial by a fair preponderance of the evidence.[1]

---

[1] "The [fact-finding] function is vested in the trial court with its unique opportunity to view the evidence presented in a totality of circumstances, i.e., including its observations of the demeanor and conduct of the witnesses and parties . . . ." (Internal quotation marks omitted.) *Cavolick* v. *DeSimone*, 88 Conn. App. 638, 646, 870 A.2d 1147, cert. denied, 274 Conn. 906, 876 A.2d 1198 (2005).

"It is well established that in cases tried before courts, trial judges are the sole arbiters of the credibility of witnesses and it is they who determine the weight to be given specific testimony. . . . It is the quintessential function of the fact finder to reject or accept certain evidence . . . ." (Internal quotation marks omitted.) *In re Antonio M.*, 56 Conn. App. 534, 540, 744 A.2d 915 (2000). "The sifting and weighing of evidence is peculiarly the function of the trier [of fact]. [N]othing in our law is more elementary than that the trier [of fact] is the final judge of the credibility of witnesses and of the weight to be accorded their testimony. . . . The trier is free to accept or reject, in whole or in part, the testimony offered by either party." (Citations omitted; internal quotation marks omitted.) *Smith* v. *Smith*, 183 Conn. 121, 123, 438 A.2d 842 (1981).

The trial court's function as the fact finder "is to draw whatever inferences from the evidence or facts established by the evidence it deems to be reasonable and logical." (Internal quotation marks omitted.) *In re Christine F.*, 6 Conn. App. 360, 366, 505 A.2d 734, cert. denied, 199 Conn. 808, 809, 508 A.2d 769, 770 (1986). "[T]riers of fact must often rely on circumstantial evidence and draw inferences from it. . . . Proof of a material fact by inference need not be so conclusive as to exclude every other hypothesis. It is sufficient if the evidence produces in the mind of the trier a reasonable belief in the probability of the existence of the material fact." (Citation omitted; internal quotation marks omitted.) *Coville* v. *Liberty Mutual Ins. Co.*, 57 Conn. App. 275, 285, 748 A.2d 875 (2000).

"While a plaintiff is entitled to every favorable inference that may be legitimately drawn from the evidence, and has the same right to submit a weak case as a strong one, the plaintiff must still sustain the burden of proof on the contested issues in the complaint and the defendant need not present any evidence to contradict it. *Lukas* v. *New Haven*, 184 Conn. 205, 211, 439 A.2d 949 (1981). The general burden of proof in civil actions is on the plaintiff, who must prove all the essential allegations of the complaint." (Internal quotation marks omitted.) *Gulycz* v. *Stop & Shop Cos.*, 29 Conn. App. 519, 523, 615 A.2d 1087, cert. denied, 224 Conn. 923, 618 A.2d 527 (1992). The standard of proof, a fair preponderance of the evidence, is "properly defined as the better evidence, the evidence having the greater

Robert LaPerla is the principal of the plaintiff. He has been in the jewelry business for more than thirty years. His jewelry store, La Perla, Ltd., Fine Jewelers, was located in West Hartford center at the time of the loss. Max Zeller Furs was located nearby. LaPerla had known the proprietors of Max Zeller Furs for many years, including Kevin Zeller.

On the Sunday before Thanksgiving, November 21, 2004, Zeller came into the jewelry store with a gentleman identified as John Cohen. Zeller introduced Cohen as a psychiatrist who worked in the Hartford area. He told LaPerla that the Zeller family had known Cohen for years and that Cohen had purchased furs from the Zellers. Cohen was in the market for fine jewelry, and Zeller asked LaPerla to give Cohen every courtesy. Cohen reportedly had a prior bad experience with another jeweler. Zeller then excused himself and returned to his store.

Cohen told LaPerla that his anniversary was coming up and that he was looking to purchase a larger diamond ring for his wife. They walked around the store looking at different jewelry. Cohen said that he had moved back to Longmeadow, Massachusetts, from Virginia, where he worked for the Navy debriefing submariners. He was now working at Saint Francis Hospital and Medical Center and seeing patients from the Groton submarine base. Cohen talked to LaPerla about purchasing a two and one-half carat diamond. LaPerla planned to call several of his diamond brokers in New York City to find the type of diamond that Cohen was looking for.

On Tuesday, November 23, 2004, LaPerla contacted Cohen by paging him at the Bethesda Naval Hospital. Cohen said that he was planning to come back to the store with his sister-in-law on Sunday.

weight, the more convincing force in your mind." (Internal quotation marks omitted.) *Cross* v. *Huttenlocher*, 185 Conn. 390, 394, 440 A.2d 952 (1981).

On the Sunday after Thanksgiving, November 27, 2004, Cohen returned to the store, alone. In the meantime, LaPerla had gone to one of his brokers and had some diamonds to show to Cohen. After much discussion, Cohen focused his attention on a specific two and one-half carat diamond and setting. Cohen told LaPerla that he needed some time to think about it because he was also talking to a jeweler in the Washington, D.C., area.

On Tuesday, November 30, 2004, LaPerla called Cohen to inquire whether he had made a decision. Cohen told him that he was scheduled to give a lecture on clinical psychology at the Fox Institute in West Hartford. On Thursday, December 2, 2004, LaPerla tracked down Cohen at the Fox Institute. LaPerla thought the sale was building in a favorable fashion. During their conversation, Cohen indicated that he was going to purchase the diamond ring with the two and one-half carat diamond.

The two spoke again on Friday morning, December 3, 2004. Cohen said that he also wanted to purchase an oval diamond that LaPerla had on consignment. The oval diamond was to be set in a pendant. Previously, Cohen had indicated that Friday was his wedding anniversary. He told LaPerla that he planned to come to the store by 5 p.m. to pick up the jewelry. When Cohen failed to come to the store by 5 p.m., LaPerla called him. Cohen said that he had an emergency with one of his patients and that he would have to come in on Saturday morning. LaPerla offered instead to meet Cohen at Saint Francis Hospital and Medical Center with the jewelry that Cohen was planning to purchase.

After the telephone conversation, LaPerla went to Saint Francis Hospital and Medical Center and had Cohen paged. Cohen appeared, and they walked together to a small cafeteria where LaPerla showed

Cohen the two pieces of jewelry. They discussed the sale. The diamond ring was priced at $38,000; the oval diamond pendant was $20,000. Cohen then wrote a check for the agreed price of $61,925.20, which included 6 percent sales tax, and handed it to LaPerla. The check was drawn on an account of the Advest Bank & Trust Company (Advest), an equity bank. LaPerla was familiar with Advest from other dealings and felt comfortable accepting the check. The check also listed as Cohen's address the medical arts building where many Saint Francis Hospital and Medical Center physicians had their offices. After accepting the check, LaPerla giftwrapped the diamond ring and pendant, and gave the pieces to Cohen. As Cohen escorted LaPerla down the hallway, Cohen called Zeller to express his appreciation for the introduction to LaPerla. Cohen also told Zeller that he would not be able to get to the store to pick up the furs until Saturday morning. LaPerla then said goodbye and headed home. When leaving the hospital, LaPerla believed that he had completed a transaction with Cohen for the sale of the jewelry.

On Saturday morning, December 4, 2004, LaPerla went to a bank to deposit the check and then went to his store. At around 10:15 a.m., the Zellers came to the store and advised LaPerla that one of the Zellers had driven past the Longmeadow address that Cohen had given and realized that it was a false address. LaPerla then ran over to the bank to determine the status of the check. The bank indicated that the check still needed to be processed. LaPerla reported the theft to the police as required by the policy. LaPerla subsequently learned that the account was not active and that the check was invalid.

Over time, LaPerla learned more details about Cohen, including that Cohen had not actually given a lecture at the Fox Institute. At trial, LaPerla testified that he

was tricked and that Cohen's plan to purchase the jewelry was a fraudulent scheme. LaPerla admitted that he was not forced into making the sale to Cohen.

As a result of his dealings with Cohen, LaPerla suffered substantial losses. He had to pay approximately $28,000 to the diamond broker for the two and one-half carat diamond and $12,500 to the consignment client for the oval diamond. Altogether, LaPerla's out-of-pocket expenses for the jewelry totaled approximately $42,079.

The defendant had issued a jewelers block coverage policy to the plaintiff. It was a standard policy drafted by the defendant. On the date of loss, the premium was paid in full, and the policy was in effect. The policy had a limit on the amount of recovery of $25,000. There was a $5000 deductible. Through its insurance agent, the plaintiff made a loss claim under the jewelers block coverage provision. On or about June 6, 2005, the defendant denied the loss claim. After the claim was denied, the plaintiff filed suit against Cohen on August 15, 2005.

The plaintiff also sued the Zellers regarding their involvement in this matter. The lawsuit against the Zellers was eventually settled for $10,000.

### III

### DISCUSSION

### A

### Breach of Contract

The plaintiff's claim is that the jewelers block coverage provision provides coverage for this loss and that the defendant's refusal to pay the loss constitutes a breach of that contract. The plaintiff argues that LaPerla and Cohen had entered into a binding contract for the sale of the jewelry and that LaPerla was bound by his promise to deliver the jewelry to Cohen in return for payment. Specifically, the plaintiff claims in its posttrial

brief that "LaPerla never 'voluntarily' parted with the jewelry. Mr. LaPerla objectively and reasonably felt obligated to deliver the jewelry upon receipt of payment for the goods. Mr. LaPerla's obligation to deliver the jewelry was triggered once Dr. Cohen's obligation was met (the payment) of $61,925,20. . . . Mr. LaPerla was legally and contractually obligated to hand the jewelry to 'Dr. Cohen,' and his parting with it was not 'voluntary' and thus Exclusion 2.k. does not apply to bar coverage."

The defendant contends that the policy does not provide coverage for the plaintiff's claim because the claimed loss is not covered due to the "voluntary parting" exclusion of the jewelers block coverage. The defendant argues that LaPerla voluntarily parted with the jewelry after he was induced to do so by Cohen's fraudulent scheme, trick, device or false pretense. According to the defendant, in its posttrial brief, "[b]y its plain meaning, this exclusion is intended to preclude coverage for the very situation at hand. Where a policy holder is tricked into delivery of a covered property through what he thought was a real sale . . . [the [p]laintiff's argument is based on the notion that . . . Mr. LaPerla was contractually obligated to hand over the jewelry once Dr. Cohen had paid for it . . . . Applying the [p]laintiff's logic would lead . . . to a nullification of the policy exclusion . . . . If the [p]laintiff's interpretation was implemented, coverage under the jewelers block policies would extend to every bad check and bad debt that a jeweler or other retailer might incur."

The plaintiff seeks damages for breach of contract on the basis of the defendant's denial of coverage. "The essential elements for a cause of action based on breach of contract are (1) agreement formation, (2) performance by one party, (3) breach of the agreement by the other party, (4) direct and proximate cause, and (5) damages." *Greco Properties, LLC* v. *Popp*, Superior

Court, judicial district of Hartford, Docket No. CVH 7628 (February 15, 2008) (*Bentivegna, J.*), citing *McCann Real Equities Series XXII, LLC* v. *David McDermott Chevrolet, Inc.*, 93 Conn. App. 486, 503–504, 890 A.2d 140, cert. denied, 277 Conn. 928, 895 A.2d 798 (2006).

The rule of construction of insurance contracts is clear. "It is the function of the court to construe the provisions of the contract of insurance. . . . An insurance policy is to be interpreted by the same general rules that govern the construction of any written contract and enforced in accordance with the real intent of the parties as expressed in the language employed in the policy. . . . The determinative question is the intent of the parties, that is, what coverage the . . . [plaintiff] expected to receive and what the defendant was to provide, as disclosed by the provisions of the policy. . . . If the words in the policy are plain and unambiguous the established rules for the construction of contracts apply, the language, from which the intention of the parties is to be deduced, must be accorded its natural and ordinary meaning, and courts cannot indulge in a forced construction ignoring provisions or so distorting them as to accord a meaning other than that evidently intended by the parties. . . . When interpreting a contract, we must look at the contract as a whole, consider all relevant portions together and, if possible, give operative effect to every provision in order to reach a reasonable overall result. . . .

"It is a basic principle of insurance law that policy language will be construed as laymen would understand it and not according to the interpretation of sophisticated underwriters, and that ambiguities in contract documents are resolved against the party responsible for its drafting; the policyholder's expectations should be protected as long as they are objectively reasonable from the layman's point of view. . . . The premise

behind the rule is simple. The party who actually does the writing of an instrument will presumably be guided by his own interests and goals in the transaction. He may choose shadings of expression, words more specific or more imprecise, according to the dictates of these interests. . . . A further, related rationale for the rule is that [s]ince one who speaks or writes, can by exactness of expression more easily prevent mistakes in meaning, than one with whom he is dealing, doubts arising from ambiguity are resolved in favor of the latter." (Citations omitted; internal quotation marks omitted.) *O'Brien* v. *United States Fidelity & Guaranty Co.*, 235 Conn. 837, 842–43, 669 A.2d 1221 (1996).

"A court will not torture words to import ambiguity where the ordinary meaning leaves no room for ambiguity . . . . Similarly, any ambiguity . . . must emanate from the language used in the contract rather than from one party's subjective perception of the terms. . . . Moreover, [t]he mere fact that the parties advance different interpretations of the language in question does not necessitate a conclusion that the language is ambiguous. . . . If the language of the contract is susceptible to more than one reasonable interpretation, the contract is ambiguous. . . . By contrast, language is unambiguous when it has a definite and precise meaning . . . concerning which there is no reasonable basis for a difference of opinion." (Citation omitted; internal quotation marks omitted.) *Goldberg* v. *Hartford Fire Ins. Co.*, 269 Conn. 550, 559, 849 A.2d 368 (2004). "[A]ny ambiguity in the terms of an insurance policy must be construed in favor of the insured because the insurance company drafted the policy." (Internal quotation marks omitted.) *Zulick* v. *Patrons Mutual Ins. Co.*, 287 Conn. 367, 373, 949 A.2d 1084 (2008). "[T]his rule of construction favorable to the insured extends to exclusion clauses." (Internal quotation marks omitted.) *Allstate*

*Ins. Co.* v. *Barron*, 269 Conn. 394, 406, 848 A.2d 1165 (2004).

In resolving this coverage dispute, the court must first examine the relevant language of the policy at issue. The jewelers block coverage provision provides in relevant part:

"A. COVERAGE

"We will pay for 'loss' to Covered Property from any of the Covered Causes of Loss.

"1. COVERED PROPERTY, as used in this Coverage Form, means:

"a. Your stock in trade consisting of jewelry, precious and semi-precious stones, precious metals and alloys and other stock used in your business . . . .

"3. COVERED CAUSES OF LOSS

"Covered Causes of Loss means RISKS OF DIRECT PHYSICAL 'LOSS' to the Covered Property except those causes of 'loss' listed in the Exclusions. . . .

"B. EXCLUSIONS . . .

"2. We will not pay for 'loss' caused by or resulting from any of the following:

"k. Voluntary parting with any property by you or anyone entrusted with the property if induced to do so by any fraudulent scheme, trick, device or false pretense."

The parties have not provided, and this court has not discovered, any Connecticut case law directly on point with respect to a "voluntary parting" exclusion. A review of federal and sister state precedent has revealed several cases addressing the applicability of similar exclusionary language.

## 1

### Cases in Which Exclusion Found to be Inapplicable

There are several cases in which coverage was not excluded when the policy contained similar "voluntary parting" language. For example, in *McConnell* v. *Fireman's Fund Ins. Co.*, 178 F.2d 76, 77 (5th Cir. 1949), cert. denied, 339 U.S. 952, 70 S. Ct. 840, 94 L. Ed. 1365 (1950), the insured, a used car dealer, sought recovery from the insurer for a loss resulting from the theft of an automobile after a supposed prospective buyer took the automobile on a test drive. At the conclusion of the insured's case, the insurer moved for dismissal on three grounds, including that "the loss complained of fell within an exception to the coverage of the policy, because the insured voluntarily parted with possession of the car even though induced to do so by a fraudulent scheme, trick, device, or false pretense." Id. The District Court sustained the motion for dismissal and rendered judgment in favor of the insurer. Id.

The question on appeal was "whether insured's loss was covered by the policy, or whether it came within the exception to the coverage set out by the insurer relating to 'loss suffered by the insured in case he voluntarily parts with title to or possession of any automobile at his own risk.' " Id. In reversing the judgment of dismissal, the Court of Appeals held that permitting the supposed prospective purchaser to take the car for a test drive was not a voluntary parting with possession within the exception to coverage because under the language of the policy, coverage extended to sales, service, demonstration and repair service. Id., 78. The Court of Appeals stated that "[t]he insurer here knew that appellant was a used-car dealer, and it issued this policy on its dealer's form, which contemplated and covered theft of automobiles while they were being used for demonstration purposes. The demonstration

of automobiles is an essential and customary method used by dealers in making sales." Id.

Similarly, in *Sam Hootstein & Sons, Inc.* v. *Hartford Fire Ins. Co.*, 3 Mass. App. 718, 323 N.E.2d 919 (1975), the Appeals Court overruled the exceptions to the trial court's ruling that the voluntary parting exception did not apply. There, the insured sought to recover damages against the insurer for "the loss of goods taken (by a man posing as a driver for the plaintiff's trucking contractor) from the loading platform where they had been placed awaiting the arrival of the contractor . . . ." Id. "[T]he imposter made off with the goods before signing the customary bills of lading and in the absence of the plaintiff's employee in charge of the goods (who had gone in search of a pen in order that the necessary signatures could be obtained)." Id., 718–19.

The Appeals Court held that "there was no 'voluntary parting with . . . possession' of the goods by the plaintiff within the meaning of [the] exclusion [because] possession of the goods remained with the plaintiff at least until they were driven away from the platform, and the plaintiff's employee, though inadvertently facilitating their theft by his temporary absence, did not part with them 'voluntar[il]y.' . . . Nor were the goods ever 'entrusted' to the imposter . . . as the plaintiff's employee did not 'commit or surrender' them to the driver . . . ." (Citations omitted.) Id., 719.

Another example in which coverage was not excluded can be found in *EOTT Energy Corp.* v. *Storebrand International Ins. Co.*, 45 Cal. App. 4th 565, 52 Cal. Rptr. 2d 894, review denied, 1996 Cal. LEXIS 4519 (Cal. August 14, 1996), in which the insured marketer of petroleum products suffered a loss of fuel taken from a pumping facility by tank drivers on hundreds of occasions over an approximately one year period. The language of the exclusion denied coverage for a loss that

results from the insured's act of "voluntarily parting with title or possession of any property if induced to do so by any fraudulent scheme, trick, device or false pretense." (Internal quotation marks omitted.) Id., 573.

The Court of Appeals found that "[w]hile it may be true that the access cards enabled the dishonest truck drivers to bring their trucks to the fuel racks and to pump the fuel, such circumstances in no way enabled them to steal the fuel. That could only be accomplished by the physical act of disengaging the fuel meters. This act, which was obviously never anticipated or agreed to by [the insured], was what enabled the thefts to be accomplished. We can see no basis whatever for [the insured's] conclusion that these circumstances demonstrate a 'voluntary' parting with property (i.e., the diesel fuel) as the result of a fraudulent scheme, trick or device. We believe the trial court put it very well when it stated in its order: 'The court believes it would probably be theft by trickery if the perpetrators took fuel (per the agreement) but never paid for it or paid for it with a worthless check as in *Grady Motors Corp.* v. *Travelers Fire Ins. Co.* [147 F. Sup. 290 (D.D.C. 1957)], because in that situation the insured voluntarily parted with fuel. It is not voluntary where a meter is dismantled and fuel is taken without the amount being recorded. It would also be theft by trickery if the insured was tricked into providing an access card to an unauthorized person. That circumstance would be more analogous to *Outwest Bean, Inc.* v. *National Fire Ins. Co.* [514 P.2d 782 (Colo. App. 1973)] where the insured entrusted two truckloads of beans to unauthorized persons. The Court finds that the situation here is more analogous to *Sam Hootstein & Sons, Inc.* v. *Hartford Fire Ins. Co.* [supra, 3 Mass. App. 718], where the insured left property on a loading platform in anticipation of the arrival of a trucking contractor and an individual purporting to work for the trucking contractor took the

property. There, the insured provided access to goods, but did not voluntarily part with them. Because the Court finds that Plaintiff did not voluntarily part with the diesel fuel, the loss is not excluded by the 'theft by trickery' exclusion." *EOTT Energy Corp.* v. *Storebrand International Ins. Co.*, supra, 45 Cal. App. 4th 573–74.

2

Cases in Which Exclusion Found to be Applicable

The defendant has cited several cases concluding that coverage was excluded under similar "voluntary parting" exclusionary policy language. The court will review these cases, as well as others, in turn. In *Bailey Travel Corp.* v. *General Casualty Co. of Wisconsin*, Docket No. 1-200/00-1130, 2001 Iowa App. LEXIS 384 (Iowa App. June 13, 2001), the Court of Appeals addressed whether a credit card scheme, by which a fictitious physicians' group obtained airline tickets from a travel agency through false identification and phony credit card accounts, was excluded. The insured filed a claim seeking insurance benefits under the policy to cover the loss. Id., *5. After the claim was denied by the insurer, the insured filed suit alleging breach of contract. Id. The District Court granted the insured travel agency's motion for summary judgment and denied the insurer's motion for summary judgment. Id.

The insurer appealed on three grounds, including that "(2) the 'false pretense' exclusion precludes coverage for the loss . . . ." Id., *2. The specific exclusion provided that "General Casualty would not pay for loss or damage resulting from 'voluntary parting with any property . . . if induced to do so by any fraudulent scheme, trick, device or false pretense.' " Id., *3.

In construing the voluntary parting exclusion, the Court of Appeals found that "[i]n relevant part, the exclusionary clause in which the term 'voluntary'

appears precludes coverage for loss or damage caused by, 'Voluntary parting with any property . . . if induced to do so by any fraudulent scheme, trick, device or false pretense.' The terms 'fraudulent scheme, trick, device or false pretense' all clearly indicate a lack of knowledge of essential facts. The clause therefore clearly indicates that acts, here the parting with tickets, can be without knowledge of essential facts, even influenced, induced or impelled by false and fraudulent representations, and still be 'voluntary.' " Id., *11–*12. The Court of Appeals concluded that the District Court "erred in determining the 'false pretense' exclusion did not preclude coverage for the wrongfully abstracted tickets" and reversed and remanded the case for further proceedings. Id., *13.

In *United States Fidelity & Guaranty Co.* v. *J.D. Johnson Co.*, 438 So. 2d 917, 918 (Fla. App. 1983), an insured wholesaler brought suit against an insurer, seeking to recover for loss under an insurance policy. There, equipment was delivered by the insured's employees to certain persons believed to be employees of a retail business that had a credit arrangement. Id. The retail business later denied purchasing thousands of dollars worth of equipment and refused to pay the insured. Id. The trial court granted the insured's motion for summary judgment and denied the insurer's motion. Id., 918–19. The policy included an exclusion for losses caused by "[v]oluntary parting with title or possession of any property by the named insured or others to whom the property may be entrusted if induced to do so by any fraudulent scheme, trick, device or false pretense." (Internal quotation marks omitted.) Id., 919.

The District Court of Appeals held that "[w]e construe the policy terms 'fraudulent scheme, trick, device or false pretense' as including the circumstances alleged in this case where equipment was intentionally delivered by [the insured's] employees to certain persons,

even though [the insured] was induced to make such delivery by misrepresentations as to that person's true identity or authority to receive such property. . . . Such 'parting,' while induced by fraud, is nonetheless 'voluntary.' " (Citation omitted.) Id., 921. The order granting the motion for summary judgment in favor of the insured was reversed, and the case was remanded for further proceedings. Id.

The District Court in *Grady Motors Corp.* v. *Travelers Fire Ins. Co.*, supra, 147 F. Sup. 290, considered whether the voluntary parting exclusion precluded coverage under the policy in ruling on the parties' motions for summary judgment. In that case, the insured had delivered a new automobile to a person who represented himself as a physician (Powell). Id., 291. The insured received a check drawn on a local bank from Powell for the full purchase price of the automobile. Id. Powell was given a temporary registration card and a retail buyer's order, and drove away in the vehicle. Id. Neither he nor the car was ever seen again. Id. The check was not honored because Powell did not have an account with the bank. Id.

In granting the insurer's motion for summary judgment and denying the insured's motion for summary judgment, the District Court held: "It will be noted that the policy excludes from its coverage a loss resulting from a voluntary parting with title if induced by fraud; or a loss from theft by a person entrusted by plaintiff with custody or possession. It therefore excludes loss when title passes; and if it does not pass, it excludes loss by theft by a person entrusted with custody or possession. The comprehensiveness of this provision therefore eliminates the necessity for a decision on the question of whether or not title passed in this instance. If it did pass, defendant is not liable; and if it did not pass, of necessity the possession of the automobile was entrusted to Powell, who in that case obtained it by

larceny by trick, and defendant is not liable. In other words, it seems clear that the policy excludes from its coverage any loss by theft of the kind here involved, and by the breadth of the language employed, excludes liability for losses of the 'confidence man' variety, as they are sometimes colloquially described." Id.

In *Outwest Bean, Inc.* v. *National Fire Ins. Co. of Hartford*, supra, 514 P.2d 782, the trial court rendered judgment in favor of the insured, a bean dealer, in an action brought against the insurer after a loss claim was denied on the basis of a voluntary parting exception. There, the insured had received an order for two truckloads of beans from a Texas corporation. Id., 783. Arrangements were made for delivery. Id. The beans were loaded onto trailer trucks of a company, which was subsequently determined to not exist. Id. No trace was ever found of the beans, trucks or drivers. Id.

A provision of the policy at issue provided: "This policy does not insure against any loss caused by or resulting from . . . (e) Insureds voluntarily parting with title or possession of any property, if induced to do so by any fraudulent scheme, trick, device or false pretense . . . ." (Internal quotation marks omitted.) Id. In reversing the judgment in favor of the insured, the Court of Appeals held that the insured's employees "were plaintiff's representatives and in that capacity entrusted possession of the beans to the parties responsible for the fraudulent scheme. This falls squarely within the terms of the [voluntary parting] contract provision, and therefore, recovery under the policy should have been denied." Id., 783–84.

In *Milburn* v. *Federated Mutual Implement & Hardware Ins. Co.*, 349 P.2d 644 (Okla. 1960), an action was commenced against an insurer for a claimed loss of an automobile resulting from a fraudulent scheme. The case involved a fraudulent purchase of a new car by a

John Lawrence Lewis. Id., 645. The exclusion provided: "The Policy Does Not Apply: Under any coverage—to loss resulting from either the insured voluntarily parting with title and possession of any automobile as induced so to do by any fraudulent scheme, trick, device, false pretense, or from embezzlement, conversion, secretion, theft, larceny, robbery or pilferage committed by any person including any employee, entrusted by the insured with either custody or possession of the automobile." (Internal quotation marks omitted.) Id.

In affirming the trial court's order sustaining a demurrer to the petition in favor of the insurer, the Oklahoma Supreme Court held that "[t]he plaintiff's petition shows, without question, that he gave Lewis possession and custody of the automobile though induced to do so by a fraudulent scheme, thus, in our opinion, invoking the terms of the 'Exclusion Clause.' " Id.

This court has located two other cases that are helpful in construing "voluntary parting" exclusionary policy language. In *Galloway* v. *Marathon Ins. Co.*, 220 Ark. 548, 248 S.W.2d 699 (1952), an automobile dealer insured had sold a vehicle to a person who gave the dealer a check, which he knew to be worthless. The insurance policy excluded from coverage any "theft, larceny, robbery, or pilferage that is caused by any person to whom the partnership 'voluntarily parts with title and/or possession, whether or not induced so to do by any fraudulent scheme, trick, device, or false pretense.' " Id., 549.

In affirming the trial court's decision in favor of the insurer, the Arkansas Supreme Court held: "Clauses like this one are frequently found in policies insuring automobile dealers against loss and have been construed by the courts in many cases. Construing the clause against the insurer, the courts hold that for the

exception to apply the insured must part with possession as distinguished from mere custody. Thus where the insured's salesman entrusted custody of the car to a hotel employee so that it could be driven to the hotel garage, it was held that possession had not been relinquished. . . . But when the dealer voluntarily parts with actual possession rather than mere custody, the loss is excluded from the coverage of the contract. . . . In the case at bar the appellants voluntarily parted with title as well as actual possession. The loss is therefore not covered by the contract." (Citations omitted.) Id., 549–50.

The trial court's rendering of summary judgment in favor of the insurer was reversed in *Van Sumner, Inc. v. Pennsylvania National Mutual Casualty Ins. Co.*, 74 N.C. App. 654, 329 S.E.2d 701, review denied, 314 N.C. 676, 336 S.E.2d 406 (1985), in which the exclusion provision did not include "voluntary parting" language. There, the insured seller and lessor of construction equipment received a call from a person who identified himself as a foreman for a construction company doing work at a local water treatment plant regarding the rental of a backhoe. Id., 655. The insured had done business before with the construction company. Id. The backhoe was delivered to the location requested, and someone was there to take delivery. Id. After an invoice was mailed, the construction company notified the insured that the backhoe was never rented by or delivered to the company or any of its employees. Id. The backhoe was never recovered. Id., 656.

The policy contained the following language: "THIS POLICY DOES NOT INSURE AGAINST . . . (h) Infidelity of Insured's employees or person to whom the insured property is entrusted . . . ." (Internal quotation marks omitted.) Id. The court held that "[h]ad [the insurer] in the present case excluded from coverage losses caused by a *voluntary parting* with possession,

whether or not induced by fraud, we would have no difficulty in finding that [the insured's] loss was excluded from coverage. However, [the insurer] chose the language in its policy and chose to exclude only those losses occasioned by *infidelity* of one to whom the property was entrusted, rather than all losses occasioned by trick or fraud. In our view, the exclusion as written by defendant is susceptible of differing constructions, and we have construed it in favor of coverage." (Emphasis added.) Id., 660.

### 3

### Analysis

The issue presented is whether the plaintiff's loss was covered by the policy or whether it came within the exception to coverage set out by the defendant relating to "voluntary parting" in the jewelers block provision.

The plaintiff was insured under a policy of insurance issued by the defendant, which was in effect on December 3, 2004. The policy included jewelers block coverage. Jewelry was included in the schedule of the insured or covered property. LaPerla and Cohen discussed the sale over several days. On the date of loss, LaPerla went to Saint Francis Hospital and Medical Center to meet with Cohen. After discussing the sale, Cohen gave LaPerla a check for the full amount. LaPerla accepted the check, giftwrapped the jewelry and gave the jewelry to Cohen. Cohen took possession of the jewelry and escorted LaPerla to the exit. They exchanged pleasantries, and LaPerla left. LaPerla believed that he had completed a transaction with Cohen for the sale of the jewelry. At trial, LaPerla admitted that he was tricked and that Cohen's plan to purchase the jewelry was a fraudulent scheme. He was not forced to make the sale to Cohen. The uncontroverted evidence demonstrates

that the claimed losses were induced by a fraudulent scheme, trick, device or false pretense.

The exclusionary clause excludes from coverage any loss that results from "[v]oluntary parting with any property . . . if induced to do so by any fraudulent scheme, trick, device or false pretense." "Voluntary" is not defined in the policy. The court must accord the term its natural and ordinary meaning, and not torture the word to import ambiguity when none exists.

This situation is more analogous to those above-mentioned cases in which coverage was excluded. The evidence demonstrates that LaPerla voluntarily parted with the jewelry. As in *United States Fidelity & Guaranty Co.*, LaPerla intentionally delivered the jewelry to Cohen. He was not forced to make the sale. Even though LaPerla and Cohen had come to the point of completing the sale, LaPerla did not have to accept the check if it aroused any of his suspicions. LaPerla testified that he felt comfortable accepting the check because he was familiar with the bank on which it was drawn, as well as the address noted on the check. LaPerla was motivated to make the sale. He did everything he could to facilitate the sale, including going to Saint Francis Hospital and Medical Center that unfortunate night. LaPerla voluntarily gave Cohen possession and custody of the jewelry, though induced to do so by a fraudulent scheme. See *Milburn* v. *Federated Mutual Implement & Hardware Ins. Co.*, supra, 349 P.2d 645.

LaPerla parted with actual possession and custody of the jewelry. As with the situation in *Outwest Bean, Inc.*, LaPerla entrusted actual possession of the jewelry to Cohen, not just custody. The transfer of possession was complete. This is not a situation like that in *McConnell*, in which the insured entrusted temporary custody of the vehicle to a supposed prospective buyer for a test drive. LaPerla surrendered the jewelry to Cohen

upon receipt of the check. He parted with actual possession and custody of the property, as distinguished from mere custody.

Although the parting was induced by fraud, including misrepresentations as to Cohen's true identity and a worthless check, it was nonetheless voluntary. See *United States Fidelity & Guaranty Co.* v. *J.D. Johnson Co.*, supra, 438 So. 2d 921. As the court stated in *Bailey Travel Corp.*, the parting can be still be voluntary even if it is without knowledge of essential facts or influenced, induced or impelled by false and fraudulent representations. As with the situation in *Milburn*, LaPerla gave possession and custody of the jewelry to Cohen, though induced to do so by a fraudulent scheme. There is still a voluntary parting, even though Cohen paid for the jewelry with a bad check. See *Grady Motors Corp.* v. *Travelers Fire Ins. Co.*, supra, 147 F. Sup. 291. By its plain terms, the jewelers block coverage provision excludes from its coverage liability for losses of the "confidence man" variety. Id. "Confidence man" is defined as "[o]ne who defrauds a victim by first gaining the victim's confidence and then, through trickery, obtaining money or property; a swindler. . . . Often shortened to *con man*." Black's Law Dictionary (8th Ed. 2004).

When looking at the policy as a whole, the "voluntary parting" exclusion applies here, where LaPerla voluntarily parted with actual possession and custody of the property by intentionally delivering the jewelry to Cohen. The court finds that the plaintiff voluntarily parted with possession of the jewelry so as to invoke the exception to the coverage set out previously. Accordingly, there is no insurance coverage for this loss. Having found in favor of the defendant on the exclusion issue, the court does not need to address the question of whether the plaintiff's claims are time barred.

## B

### Breach of Implied Covenant of Good Faith and Fair Dealing

In the second count of the complaint, the plaintiff alleges that the defendant breached the implied covenant of good faith and fair dealing by denying the plaintiff's loss claim under the jewelers block coverage provision. "[E]very contract carries an implied duty requiring that neither party do anything that will injure the right of the other to receive the benefits of the agreement. . . . The covenant of good faith and fair dealing presupposes that the terms and purpose of the contract are agreed upon by the parties and that what is in dispute is a party's discretionary application or interpretation of a contract term. . . . To constitute a breach of [the implied covenant of good faith and fair dealing], the acts by which a defendant allegedly impedes the plaintiff's right to receive benefits that he or she reasonably expected to receive under the contract must have been taken in bad faith." (Internal quotation marks omitted.) *Ramirez* v. *Health Net of the Northeast, Inc.*, 285 Conn. 1, 16–17 n.18, 938 A.2d 576 (2008). Here, the court has concluded that the plaintiff voluntarily parted with possession of the jewelry so as to invoke the exception to coverage. Accordingly, there is nothing in the defendant's actions that would constitute bad faith in its appropriate denial of the plaintiff's loss claim.

## IV

### CONCLUSION AND ORDER

For the stated reasons, judgment is rendered in favor of the defendant.