[Cite as *Canfield Motor Sports, Inc. v. Motorist Mut. Ins. Co.*, 2017-Ohio-735.]

STATE OF OHIO, MAHONING COUNTY

IN THE COURT OF APPEALS

SEVENTH DISTRICT

| | | |
|---|---|---|
| CANFIELD MOTOR SPORTS, INC. | ) | |
| | ) | |
| PLAINTIFF-APPELLEE | ) | |
| | ) | CASE NO. 16 MA 0001 |
| VS. | ) | |
| | ) | OPINION |
| MOTORIST MUTUAL INSURANCE COMPANY | ) | |
| | ) | |
| | ) | |
| DEFENDANT-APPELLANT | ) | |

CHARACTER OF PROCEEDINGS:     Civil Appeal from the Court of Common Pleas of Mahoning County, Ohio Case No. 13 CV 2161

JUDGMENT:     Affirmed.

APPEARANCES:
For Plaintiff-Appellee     Attorney Stuart Strasfeld
100 East Federal Street, Suite 600
Youngstown, Ohio 44503-1893

For Defendant-Appellant     Attorney Merle Evens, III
Millenium Centre, Suite 300
200 Market Avenue, North
P.O. Box 24213
Canton, Ohio 44701-4213

JUDGES:

Hon. Mary DeGenaro
Hon. Cheryl L. Waite
Hon. Carol Ann Robb

Dated: February 28, 2017

DeGENARO, J.

**{¶1}** Defendant-Appellant, Motorist Mutual Insurance Company appeals the trial court judgment awarding $27,500.00 to Plaintiff-Appellee, Canfield Motor Sports, Inc. pursuant to the terms of a commercial general liability insurance policy issued by Motorist. For the following reasons, the judgment entry of the trial court is affirmed.

**{¶2}** CMS was formerly in the business of selling both new and used motorcycles, and insured under a commercial policy issued by Motorist. The "Select Dealers Plus Program", Endorsement CA 7089 (01/09) of the policy includes a section entitled "False Pretense Coverage" which provides as follows:

B.      Physical Damage Coverage is changed as follows:

1.      The following is added:

We will pay for "loss" to a covered "auto" under:

False Pretense Coverage caused by:

a.      Someone causing you to voluntarily part with the covered "auto"

by trick, scheme or under false pretenses.

**{¶3}** John Allen, the former general manager of CMS, testified that he was first contacted by a sales associate of Elite Auction Sales, Inc., John Watson, in early August of 2009. Watson solicited Allen to contract with Elite to sell CMS's motorcycles through a public auction at its facility in Murfreesboro, Tennessee. Watson explained that goods sold at public auctions typically garnered a much higher price than goods sold at private auctions. During that first telephone conversation, Allen told Watson that CMS was not interested in Elite's services. Watson contacted Allen by telephone roughly ten times during the month of August. By the end of the month, and after several discussions with Allen, Thomas Wronkovich, one of CMS's owners, instructed Allen to contract with Elite to auction ten used "sport bikes" from CMS's inventory. The sport bikes sold mainly in the springtime, and Wronkovich reasoned that it would be preferable to sell the bikes than carry them over in CMS's inventory to the following spring.

**{¶4}** Prior to contracting Elite's services, Wronkovich advised Allen to

perform a due diligence investigation of Elite's business practices. Allen contacted another dealer that had employed Elite in the past. He spoke with the general manager who did not raise any concerns regarding Elite.

**{¶5}** According to the Exclusive Auction Listing Contract, executed on September 2, 2009, CMS's motorcycles were to be sold at an absolute auction with a tentative sale date of September 5, 2009. Wronkovich and Allen agreed to sell the motorcycles through Elite without a reserve price because Watson told them that the auction would be widely publicized. Elite charged a commission of $300.00 per bike, which included transportation from Ohio to Tennessee. Elite collected the motorcycles on the day the contract was signed, and provided a tentative auction date of Saturday, September 5, 2009. Allen testified that the motorcycles were taken in a red pickup truck with an open trailer on the back. Allen believed that the titles had been sent to Elite, but conceded that he never looked up the vehicle identification numbers in order to determine whether title had transferred to Elite or the buyers at auction.

**{¶6}** On the Monday following the auction, Allen attempted to contact Elite at the telephone number provided on the contract. The recipient of the call answered, "Trotter Auction Sales." Allen asked for Watson, but he was told that Watson was unavailable. Allen was informed that Trotter Auction Sales had purchased Elite, however Allen conceded at the bench trial that he was not aware of the details of the sale. Allen had previously contacted Watson on Watson's mobile phone, but ten phone messages on Watson's mobile voice mail over the course of the next week went unanswered. Likewise, Allen made ten unsuccessful attempts to collect the purchase money for the motorcycles from Trotter Auction Sales.

**{¶7}** Despite Allen's inability to contact Watson, CMS received a facsimile transmission on September 10, 2009 of a consignor statement, which contained the details of each of the ten motorcycle sales. The statement indicated that an auction was held on September 5, 2009, and provided a description of the motorcycles which were sold at auction, the unit price, the total price received, the commission, and the

amount due to CMS, $35,400.00. However, CMS never received the amount owed under the contract from Elite.

**{¶8}** Elite filed for bankruptcy on or about September 25, 2009. Both Allen and Wronkovich conceded that they did not know the circumstances surrounding Elite's bankruptcy petition or when Elite ceased doing business. According to Wronkovich's testimony, Elite filed a Chapter 11 petition for reorganization under the Bankruptcy Code. CMS filed a claim for $35,400.00 in the bankruptcy proceeding, and was identified in the petition as one of the largest unsecured creditors. CMS received $7,838.39 from the bankruptcy court. As a consequence, CMS submitted a claim under the commercial policy on the basis that it voluntarily parted with the ten motorcycles by trick, scheme or under false pretenses.

**{¶9}** CMS filed a complaint for declaratory judgment against Motorist seeking a determination of coverage under a false pretenses endorsement, which Motorist answered. The case proceeded to a bench trial before the magistrate, who issued a decision granting CMS a judgment of $27,500.00. Motorist filed objections which CMS opposed. The trial court overruled the objections, concluding that CMS had voluntarily parted with ten motorcycles as a result of an intentional deceptive act on the part of Elite, and that the terms of the policy required reimbursement for its loss:

> Intent to deceive can be deduced from the circumstances of the transaction as a whole, as the misleading party is unlikely to admit to deceptive conduct. *In re Case No. 01-50091*, 2002 Bankr. LEXIS 1540. The timeline of events surrounding the transaction clearly establishes that Elite [ ], intended to deceive, and did deceive [CMS]. Such deceptive conduct falls under the Policy's False Pretense Coverage Clause.

**{¶10}** Motorist asserts in its sole assignment of error:

THE TRIAL COURT'S JUDGMENT FILED ON DECEMBER 8, 2015, IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

**{¶11}** Motorist contends that CMS failed to meet its burden of proof with respect to the policy language that requires evidence that CMS was induced to part with the motorcycles by trick, scheme, or false pretenses. Motorist argues that neither Allen nor Wronkovich knew the details surrounding the sale of CMS's motorcycles or the events prompting Elite's Chapter 11 bankruptcy. Likewise, Motorist asserts that CMS failed to offer testimony from any representative from Elite to establish that Elite had with false pretense induced CMS to surrender the motorcycles. Motorist concludes that the trial court drew unwarranted inferences from the dearth of evidence adduced at trial regarding Elite's motives.

**{¶12}** CMS counters that the trial court did not rely solely upon the filing of the bankruptcy petition to conclude that Elite engaged in a trick, scheme, or false pretenses. CMS argues instead that trick, scheme, or false pretenses can be inferred from the fact that Elite ceased doing business immediately after the auction.

**{¶13}** As to the standard of review of a declaratory judgement, an appellate court's "inquiry * * * involves whether the trial court's judgment was against the manifest weight of the evidence." *Allason v. Gailey*, 189 Ohio App.3d 491, 2010-Ohio-4952, 939 N.E.2d 206, ¶ 26 (7th Dist.), citing *Blair v. McDonagh,* 177 Ohio App.3d 262, 2008-Ohio-3698, 894 N.E.2d 377, ¶ 56. "Judgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed by a reviewing court as being against the manifest weight of the evidence." *Allason* at ¶2, citing *C.E. Morris Co. v. Foley Constr. Co.*, 54 Ohio St.2d 279, 280, 8 O.O.3d 261, 376 N.E.2d 578 (1978).

**{¶14}** Insurance policies are construed by the same rules used to construe contracts. *World Harvest Church v. Grange Mut. Cas. Co.*, Slip Opinion 2016-Ohio-2913, ¶ 28. In *Westfield Ins. Co. v. Galatis*, 100 Ohio St.3d 216, 2003-Ohio-5849, 797 N.E.2d 1256, the Ohio Supreme Court recognized that the court's task when interpreting an insurance policy is to "examine the insurance contract as a whole and

presume that the intent of the parties is reflected in the language used in the policy." *Id.* at ¶ 11, citing *Kelly v. Med. Life Ins. Co.*, 31 Ohio St.3d 130, 509 N.E.2d 411 (1987), paragraph one of the syllabus. Moreover, courts must "look to the plain and ordinary meaning of the language used in the policy unless another meaning is clearly apparent from the contents of the policy." *Id.*, citing *Alexander v. Buckeye Pipe Line Co.*, 53 Ohio St.2d 241, 374 N.E.2d 146 (1978), paragraph two of the syllabus. The party seeking to recover under an insurance policy bears the burden of proof to demonstrate that the policy provides coverage for the particular loss. *Chicago Title Ins. Co. v. Huntington Natl. Bank*, 87 Ohio St.3d 270, 273, 719 N.E.2d 955 (1999).

{¶15} A brief review of the history of false pretense provisions in insurance policies is instructive. Most false pretenses provisions are typically exclusionary in nature. Thus, when interpreting the false pretense language as is present in Motorist's policy here, courts have done so in order to determine if the allegedly fraudulent actions serve to exclude coverage under the policy. *See, e.g., Magolan v. Shellhouse*, 5th Dist. No. 2011-CA-105, 2012-Ohio-2144, where the vehicle owner brought an action against the automobile insurer, claiming the body shop's conduct in selling vehicle without owner's permission constituted theft. Notably, *Magolan* appears to be a case of first impression in Ohio; case law outside Ohio is based on more commonly-accepted examples of trick, scheme and false pretense, for instance, embezzlement by an employee. *See, e.g., Joe Cotton Ford Inc. v. Illinois Emcasco Ins .Co.* 389 Ill. App.3d 718, 906 N.E.2d 1279 (2009), a retail customer providing a worthless check; *LaPerla, Ltd. V. Peerless Ins. Co.*, 51 Conn.Supp. 241, 980 A.2d 971 (2009) and; *Lyday v. Ohio Farmers Insurance Co.*, 2d Dist. No. 5752,1978 WL 216210; *McConnell v. Fireman's Fund Ins. Co.*, 178 F.2d 76, 77 (5th Cir.1949), cert. denied, 339 U.S. 952, 70 S.Ct. 840, 94 L.Ed. 1365 (1950), or a prospective car purchaser providing false identification in order to test drive a car.

{¶16} In *Magolan*, the Fifth District underscored that the insured must demonstrate that the scheme or trick existed at the time when the goods are

transferred. *Magolan* at ¶16-17. Magolan contracted with Shellhouse to restore a vintage automobile. After several delays, Magolan began contacting Shellhouse every couple of months for a report on Shellhouse's progress. Several years passed. Roughly five years after the contract was executed, because Magolan had stopped calling Shellhouse and did not pay him additional money required under the contract, Shellhouse sold the automobile. Magolan's insurance policy excluded coverage for loss as a result of "anyone causing you to voluntarily part with [a covered auto] as a result of any scheme or trick." *Id.* at ¶12.

{¶17} The trial court entered summary judgment in favor of the insurer in the declaratory judgment action file by Magolan, but the Fifth District concluded that genuine issues of material fact existed as to whether Magolan voluntarily parted with the vehicle *as a result* of a trick or scheme. Although Magolan conceded that Shellhouse lied to try to placate Magolan over the course of many years when he was either unable or unwilling to restore the automobile, the Fifth District recognized that Magolan's admissions did not demonstrate that the trick or scheme existed on the date the contract was executed. The Fifth District also relied upon the many years that passed after the automobile was transferred to Shellhouse before he sold the automobile. *Id.* at ¶ 16.

{¶18} The crux of Motorist's argument is that there is no competent, credible evidence in the record from which to infer that Elite engaged in any false pretense on September 2nd, the date CMS signed the contract with Elite and took possession of the 10 motor bikes. To the contrary, the chain of events occurred over approximately a 45-day period, starting with Elite's relentless sales pitch during the month of August through the September 5th auction, the multiple unreturned phone calls, culminating in Elite's Bankruptcy petition filed on September 25th.

{¶19} There was competent, credible evidence in the record from which the trial court could infer fraudulent purpose by Elite. The events that occurred were sufficiently close in proximity to support the trial court's inference that Elite's fraudulent intent existed on September 2nd, the day the contract was executed and

the motorcycles were retrieved by Elite.

{¶20} Accordingly, Motorist's sole assignment of error is meritless, and the judgment entry of the trial court is affirmed.


Waite, J., concurs.

Robb, P. J., concurs.