[No. B089217. Second Dist., Div. Three. May 16, 1996.]

EOTT ENERGY CORP., Plaintiff, Cross-defendant and Appellant, v. STOREBRAND INTERNATIONAL INSURANCE CO. A/S et al., Defendants, Cross-complainants and Respondents.

COUNSEL

Morgan, Lewis & Bockius and Jeffrey N. Brown for Plaintiff, Cross-defendant and Appellant.

Robins, Kaplan, Miller & Ciresi and Scott G. Johnson for Defendants, Cross-complainants and Respondents.

OPINION

**CROSKEY, J.**—This case presents the question of whether an insured, having suffered a $1.5 million loss as the result of over 650 thefts of the petroleum products which it markets, will be entitled to recover for such loss under its "all risk" property insurance policy when the value of the property taken in any single theft did not exceed the $100,000 deductible provided for in the policy. The issue which we are required to resolve is whether, under the facts of this case, there was but one "occurrence" or over 650 of them.

The insured appellant, EOTT Energy Corp. (EOTT), claims that the multiple thefts were in reality an integral part of a long-standing, organized conspiracy which resulted in a systematic theft of its oil products and thus amounted to only one occurrence to which a single deductible should be applied. Because we conclude that (1) a planned and orchestrated theft of EOTT's products (if that is in fact what happened) would amount to one loss to which a single deductible should apply and (2) EOTT raised triable issues of fact as to whether such a conspiracy existed, we reverse the summary judgment granted in favor of the respondent insurer, Storebrand International Insurance Co. A/S (Storebrand).

## FACTUAL AND PROCEDURAL BACKGROUND[1]

Pursuant to a processing agreement entered into in February 1991, Paramount Petroleum Corporation (Paramount) processed crude oil and manufactured petroleum products, including diesel fuel, for EOTT at Paramount's

---

[1]The parties essentially agree on the facts on which this appeal turns. Our recitation of the facts is taken from the separate statements of undisputed facts filed by each of the parties in support of their competing cross-motions for summary judgment. We, of course, understand that Storebrand disputes EOTT's claim that the theft of its diesel fuel was pursuant to an organized conspiracy. Our recitation of EOTT's claims in that regard does not mean we have found or believe such claims to be true. We simply describe them as the factual context for our legal conclusion that such a conspiracy, *if proven*, would justify the conclusion that there was a single occurrence under the subject policy.

plant in Paramount, California. Under the terms of the agreement, EOTT had title to all of the crude oil delivered to Paramount as well as to all of the oil products produced therefrom.

EOTT was an additional insured under the two relevant "all risk" policies issued to Paramount by Storebrand for the successive annual periods of July 1, 1990, to July 1, 1991, and July 1, 1991, to July 1, 1992. These policies insured EOTT against "all risks of direct physical loss or damage occurring during the [policy period] from any external cause [except as specifically excluded]." While this coverage extended to losses due to theft, it was not intended to be a blanket fidelity bond; thus, there was an exclusion which provided that: "This policy does not insure: . . . misappropriation, secretion, infidelity or dishonesty of the Insured or any of his employees; nor loss or damage resulting from the Insured voluntarily parting with title or possession of any property if induced to do so by any fraudulent scheme, trick, device or false pretense; nor any unexplained loss, mysterious disappearance or loss or shortage disclosed on taking inventory."[2]

Finally, the policy provided for a $100,000 deductible for each "occurrence." Specifically, the policy stated, "As respects Real and Personal Property, all claims for loss, damage or expense arising out of any one occurrence . . . shall be adjusted as one claim, and from the amount of each such adjusted claim there shall be deducted the sum of USD 100,000 for Property Physical Damage . . . ." Unfortunately, the property loss portion of the policy did not define "occurrence."[3]

During the 11-month period from February 1991 through January 1992, EOTT suffered the loss of approximately 2,500,000 gallons of its diesel fuel. EOTT had issued access cards to several tanker trucking companies which enabled their drivers to gain access to the Paramount loading rack and automatic pumping facilities. An authorized driver was permitted to pull his truck up to the pumping facility and, by use of the access card, start pumping fuel. The amount of fuel pumped was measured by attached meters which recorded that amount for later billing. The drivers had 24-hour access to the pumping facility and were not supervised by EOTT personnel. The thefts of

---

[2]This exclusion is hereafter referred to as the "theft by trickery" exclusion.

[3]However, the word "occurrence" was used in the umbrella liability portion of the policy and in that part of the policy it was defined: "The term 'Occurrence,' whenever used herein, shall mean an accident or a happening or event or a continuous or repeated exposure to conditions which unexpectedly and unintentionally results in personal injury, property damage or advertising liability during the policy period. *All such exposure to substantially the same general conditions existing at or emanating from one premises location shall be deemed one occurrence.*" (Italics added.)

diesel fuel occurred when particular tanker truck drivers, after pumping a *partial* truckload, would disengage or disable the fuel meters; they would then fill their trucks and reattach or reactivate the meters.[4] As a result, the fuel meters, which were relied upon by EOTT to prepare their billings to their customers, would not reflect the true amount of diesel fuel actually pumped. The record reflects that this occurred on 653 separate occasions during the 11-month period ending in January 1992.

EOTT did not discover these criminal practices until January 1992. It is conceded that, by that date, the total value of the diesel fuel loss to EOTT was $1.5 million. EOTT submitted a timely claim for such loss to Storebrand. However, on February 9, 1993, Storebrand denied coverage on two grounds: (1) the "theft by trickery" exclusion applied in that EOTT *voluntarily* parted with possession of and title to the fuel when the various drivers filled their tanker trucks and the acts of the drivers, in disengaging and then reactivating the fuel meters after the theft was completed, constituted a "fraudulent scheme, trick, device or false pretense" within the meaning of the exclusion; and (2) each of the 653 thefts were *separate* losses and since the value of the fuel taken in each theft did not exceed the $100,000 deductible specified in the policy, Storebrand had no liability.

The record reflects that EOTT produced evidence that, in its own investigation, Storebrand discovered evidence of an ongoing and systematic conspiracy against Paramount and EOTT. In a report, dated December 20, 1992, Storebrand's investigator stated, "The theft of petroleum products in this manner[5] is said to be costing the United States $1 billion in lost tax revenues. It is well known that this organized crime is mainly managed by the Russian Mafia and émigrés from Eastern Europe. It is also accepted that many 'contract' murders have been committed by those involved in hijacking and stealing petroleum products. [¶] Prima facie therefore, there are clear indications that Paramount [and EOTT] have *long been the victim of a conspiracy* between the principal trucking companies who are authorized to load fuel at its facility. Although these trucking companies (hauliers) claim to be independent, it is our strong suspicion that this is probably far removed from the truth. Intermarriage, networking and other business and social ties suggest that such independence is more apparent than real. [¶] Such, however, is the scale of the overall problem that we have not attempted to pursue the present inquiry beyond the point where it was patently clear that [EOTT

---

[4]Apparently, the usual practice was to fill the main truck tanker with measured fuel, but to fill the trailer tanker with unmeasured or stolen fuel.

[5]The report described in detail how a number of the tanker truck drivers would disable the fuel meters after receiving a measured half load; they would then receive an *unmeasured* half load. On occasion, these drivers would make several trips in one night.

has] sustained a series of diesel fuel thefts at the hands of a number of accredited hauliers and/or their drivers. It is now also abundantly evident that these thefts have been taking place on an *organized, systematic basis,* over several years." (Italics added.)[6]

Following Storebrand's denial of EOTT's claim, EOTT, on July 29, 1993, filed this action for breach of contract and breach of the implied covenant of good faith.[7] In August 1994, EOTT and Storebrand each filed a motion for summary judgment. These cross-motions raised two issues for the trial court to resolve: (1) was coverage for EOTT's loss excluded by the "theft by trickery" exclusion; and (2) did the policy deductible of $100,000 apply to each of the 653 thefts or should this series of thefts be treated as a single occurrence?

On November 18, 1994, the trial court denied EOTT's motion and granted the one filed by Storebrand. The court ruled in Storebrand's favor on its second argument after rejecting its contention with respect to the applicability of the "theft by trickery" exclusion. Storebrand had argued that EOTT had voluntarily parted with the fuel because it voluntarily gave the tanker truck drivers *access* to the fuel pumps. The court rejected this claim because such access had been granted on the condition that the fuel would be properly accounted for and billed.

However, with respect to Storebrand's assertion that each of the 653 thefts should be regarded as separately subject to the policy's $100,000 deductible, the trial court held that the argument was meritorious and, as a result, Storebrand had no liability because no single theft met the deductible. The court, in its order granting Storebrand's motion, concluded, "The Court finds the term 'occurrence' to be unambiguous and thus applies the plain meaning of the term to the facts of this case. The thefts in this case were by different individuals at some 653 different times. Even assuming that the thefts were part of a 'scheme' or 'plan,' it would still constitute some 653 different occurrences. Thus, 653 deductibles would apply—one for each occurrence. Defendants are not liable under their policies because no single theft loss here exceeds the $100,000.00 policy deductible applicable to each 'occurrence.' "

---

[6]Storebrand contends on appeal that this report, submitted by its own investigator, was simply a theorization by him for which there was no substantiation. While that may ultimately turn out to be true, the report reads like it is stating factual conclusions. More importantly, it provides a substantial basis for our conclusion that issues of material fact exist and remain to be resolved at trial.

[7]Storebrand removed this action to the United States District Court where, after a hearing, the federal court remanded the case back to the California forum.

Judgment was thereafter entered in favor of Storebrand on January 10, 1995. EOTT filed this timely appeal.[8]

## ISSUES PRESENTED

Like the trial court, we are asked to resolve issues of law which go to the meaning to be given to the two relevant policy clauses. First, do the undisputed facts of this case demonstrate that the multiple thefts of diesel fuel fall within the exclusion for "theft by trickery"? Second, what meaning is to be given the undefined term "occurrence," and could these thefts constitute only one occurrence so as to require application of a single deductible rather than one for each of the six hundred fifty-three thefts?

## DISCUSSION

### 1. *Standard of review.*

■ Summary judgment should be granted when the evidence in support of the motion establishes that there is no material issue of fact to be tried. (Code Civ. Proc., § 437c; *Molko* v. *Holy Spirit Assn.* (1988) 46 Cal.3d 1092, 1107 [252 Cal.Rptr. 122, 762 P.2d 46].) "The trial court must decide if a triable issue of fact exists. If none does, and the sole remaining issue is one of law, it is the duty of the trial court to determine the issue of law. [Citation.]" (*Coca-Cola Bottling Co.* v. *Lucky Stores, Inc.* (1992) 11 Cal.App.4th 1372, 1377 [14 Cal.Rptr.2d 673].) Summary judgment is proper if, and only if, the affidavits in support of the motion, strictly construed, contain facts sufficient to entitle the moving party to a judgment, and those of the opposing party, liberally construed, fail to show there is a material issue of fact. (*Corwin* v. *Los Angeles Newspaper Service Bureau, Inc.* (1971) 4 Cal.3d 842, 851 [94 Cal.Rptr. 785, 484 P.2d 953].)

As already noted, there is no dispute as to the relevant facts, which we have summarized above. We exercise our independent judgment as to the legal effect of these undisputed facts. (*Coca-Cola Bottling Co.* v. *Lucky Stores, Inc.*, *supra*, 11 Cal.App.4th at p. 1377.) The sole issue with which we are concerned involves the meaning, construction and application of the language of the policy. That is a pure issue of law. (*California Shoppers, Inc.* v. *Royal Globe Ins. Co.* (1985) 175 Cal.App.3d 1, 35 [221 Cal.Rptr. 171].)

---

[8]EOTT's notice of appeal was filed on November 29, 1994; such appeal was from the *order* granting summary judgment rather than the judgment itself, which had not yet been entered. On January 12, 1995, the parties amended the notice of appeal by written stipulation so that the appeal is deemed to have been taken from the judgment as entered on January 10, 1995.

## 2. *The "Theft by Trickery" Exclusion Does Not Apply.*

We concur with the trial court's conclusion that the "theft by trickery" exclusion relied upon by Storebrand simply has no application to the facts of this case. The relevant portion of this exclusion would deny coverage for a loss which results from EOTT's act of "*voluntarily* parting with title or possession of any property if induced to do so by any fraudulent scheme, trick, device or false pretense. . . ." (Italics added.)

Storebrand argues that EOTT voluntarily distributed the access cards to the trucking companies involved in the theft of the diesel fuel. Since such cards enabled the truck drivers to gain access to the fuel racks and pumping facilities, and thus to commit the successive acts of theft, EOTT was effectively induced into parting with its fuel by the trucking companies' false promises to pay. Like the trial court, we reject that characterization of what happened in this case.

While it may be true that the access cards enabled the dishonest truck drivers to bring their trucks to the fuel racks and to pump the fuel, such circumstances in no way enabled them to steal the fuel. That could only be accomplished by the physical act of disengaging the fuel meters. This act, which was obviously never anticipated or agreed to by EOTT, was what enabled the thefts to be accomplished. We can see no basis whatever for Storebrand's conclusion that these circumstances demonstrate a "voluntary" parting with property (i.e., the diesel fuel) as the result of a fraudulent scheme, trick or device. We believe the trial court put it very well when it stated in its order: "The court believes it would probably be theft by trickery if the perpetrators took fuel (per the agreement) but never paid for it or paid for it with a worthless check as in *Grady Motors Corp.* v. *Travelers Fire Ins. Co.* (D.D.C. 1957) 147 F.Supp. 290, because in that situation the insured voluntarily parted with fuel. It is not voluntary where a meter is dismantled and fuel is taken without the amount being recorded. It would also be theft by trickery if the insured was tricked into providing an access card to an unauthorized person. That circumstance would be more analogous to *Outwest Bean, Inc.* v. *National Fire Ins. Co.* (Colo.Ct.App. 1973) 514 P.2d 782 where the insured entrusted two truckloads of beans to unauthorized persons. [¶] The Court finds that the situation here is more analogous to *Sam Hootstein & Sons, Inc.* v. *Hartford Fire Ins. Co.* (1975) 3 Mass.App.Ct. 718 [323 N.E.2d 919] where the insured left property on a loading platform in anticipation of the arrival of a trucking contractor and an individual purporting to work for the trucking contractor took the property. There, the insured provided access to goods, but did not voluntarily part with them. Because the

Court finds that Plaintiff did not voluntarily part with the diesel fuel, the loss is not excluded by the 'theft by trickery' exclusion."

3. *An Organized and Systematic Theft of Diesel Fuel Would Constitute a Single Occurrence.*

It is indeed unfortunate that the term "occurrence" is not defined in the property loss portion of the policy. ■ While it is true that the lack of a policy definition does not *by itself* render the undefined term ambiguous (*Bay Cities Paving & Grading, Inc.* v. *Lawyers' Mutual Ins. Co.* (1993) 5 Cal.4th 854, 866 [21 Cal.Rptr.2d 691, 855 P.2d 1263]), it certainly presents a problem if the term is reasonably susceptible of more than one meaning.

The principles which govern the interpretation of insurance contracts are both familiar and well settled. " 'Under statutory rules of contract interpretation, the mutual intention of the parties at the time the contract is formed governs interpretation. (Civ. Code, § 1636.) Such intent is to be inferred, if possible, solely from the written provisions of the contract. (*Id.*, § 1639.) The "clear and explicit" meaning of these provisions, interpreted in their "ordinary and popular sense," unless "used by the parties in a technical sense or a special meaning is given to them by usage" (*id.*, § 1644) controls judicial interpretation. (*Id.*, § 1638.)' [Citations.] This reliance on common understanding of language is bedrock. [¶] Equally important are the requirements of reasonableness and context. First, 'An insurance policy provision is ambiguous when it is capable of two or more constructions both of which are *reasonable.*' [Citation.] 'Courts will not adopt a strained or absurd interpretation in order to create an ambiguity where none exists.' [Citation.] Second, '[*L*]*anguage in a contract* must be construed in the context of that instrument as a whole, and in the circumstances of that case, and *cannot be found to be ambiguous in the abstract.*' [Citations.] 'There cannot be an ambiguity per se, i.e. an ambiguity unrelated to an application.' [Citation.]" (*Bay Cities Paving & Grading, Inc.* v. *Lawyers' Mutual Ins. Co., supra,* 5 Cal.4th at p. 867.)

■ Storebrand argues that the undefined term "occurrence" has a clear and explicit meaning which governs the outcome of this case. Webster's dictionary defines "occurrence" as "something that takes place; [especially] something that happens unexpectedly and without design." (Webster's New Internat. Dict. (3d ed. 1981) p. 1561.) Similarly, Black's Law Dictionary defines "occurrence" as "[a]ny incident or event, especially one that happens without being designed or expected." (Black's Law Dict. (5th ed. 1979) p. 974). Likewise, courts interpreting *property* insurance policies have held that

the plain meaning of "occurrence" is an "event," or "incident." (*Newmont Mines Ltd.* v. *Hanover Ins. Co.* (2d Cir. 1986) 784 F.2d 127, 135-137 [holding that the definition of "occurrence" as an "event" or "incident" in jury instruction "represented an accurate construction of the plain meaning of the language used in these insurance policies"].)

Based on such definitions, Storebrand argues that the plain meaning to be given to the term of "occurrence" is that of *an* "incident" or "event." Obviously, Storebrand contends, such a definition could not embrace 653 *separate* thefts of diesel fuel over an 11-month period by several different tanker truck drivers. However, the deductible clause relied upon by Storebrand provides that "*all claims* for loss, damage or expense arising out of any one occurrence . . . shall be adjusted as one claim, . . ." Given such usage, when read in the context of the policy's promise to insure against all risks of loss *occurring* during the policy period, the term occurrence could also reasonably embrace more than one claim. Further, the term is often given a special meaning by usage; in liability policies, for example, it is defined to include a *continuous or repeated exposure to conditions.*[9]

We therefore conclude that EOTT's claim of ambiguity of the term "occurrence" cannot be resolved by reliance on the ordinary or popular meaning of everyday use. Thus, we must ask whether the definition advanced by Storebrand is consistent with EOTT's objectively reasonable expectations. (*Bank of the West* v. *Superior Court* (1992) 2 Cal.4th 1254, 1265 [10 Cal.Rptr.2d 538, 833 P.2d 545].) In so doing, we must interpret the term "occurrence" "in context, with regard to its intended function in the policy. [Citation.]" (*Ibid.*) As used in the policy, the term "occurrence" reasonably contemplates that multiple claims could, in at least some circumstances, be treated as a single occurrence or loss. It appears reasonable to us that the term "occurrence" as used in the deductible clause is effectively referring to *a loss.* In our view, EOTT's objectively reasonable expectation would embrace the conclusion that multiple claims, all due to the same cause or a related cause, would be considered a single loss to which a single deductible would apply.[10]

A number of cases which have considered the question of whether a series of acts constituted a single occurrence or multiple occurrences have looked

---

[9]Indeed, as we have noted, that is the case with the umbrella liability portion of this very policy. (See fn. 3, *ante.*)

[10]We have little doubt what Storebrand's position would be in this matter if each of the 653 thefts had resulted in a loss in excess of the deductible but with the total loss, after accounting for the deductibles, *in excess of the policy limits.* In such a circumstance the shoe would be on the other foot and Storebrand would most certainly argue that only a single loss had occurred.

to the *cause* of the loss. As one court put it, "an occurrence is determined by the cause or causes of the resulting injury [and thus a court must determine] 'if "[t]here was but one proximate, uninterrupted, and continuing cause which resulted in all of the injuries and damage." ' " (*Appalachian Ins. Co.* v. *Liberty Mut. Ins. Co.* (3d Cir. 1982) 676 F.2d 56, 61.)

In *PECO Energy Co.* v. *Boden* (3d Cir. 1995) 64 F.3d 852, the court had before it a fact situation nearly identical to that presented here. PECO, the insured, had sustained theft losses of its oil products over a six-year period which totaled over $1.2 million. The thefts were committed by the trucking company hired by PECO to transport its oil products. Claiming that this series of thefts amounted to a single occurrence, and thus was subject to only a single deductible of $100,000, PECO brought suit against its property loss insurers when they refused to pay under the applicable policies. The insurers, like Storebrand here, argued that there were multiple occurrences, each of which were subject to the deductible; since no single theft loss exceeded the deductible, the insurers claimed that they had no liability. After a trial, the jury found that these thefts of PECO's oil products aggregated 6.1% of the total oil transported by the dishonest trucking company. The trial court held that the thefts "constituted one occurrence because they were part of a single continuous scheme." (*Id.* at p. 855.) The Court of Appeals for the Third Circuit affirmed the jury's determination "that each theft was a part of a larger scheme [to steal PECO's products] *and that the scheme to steal was the proximate cause of each theft.*" (*Id.* at p. 856, italics added.) The *PECO* court concluded: "We therefore hold that when a scheme to steal property is the proximate and continuing cause of a series or combinations of thefts, the losses for liability insurance purposes constitute part of a single occurrence." (*Ibid.*; see also *Business Interiors, Inc.* v. *Aetna Cas. & Sur. Co.* (10th Cir. 1984) 751 F.2d 361 [employee embezzlement of $53,000 over eight-month period by the forgery or material alteration of forty separate checks constituted a single loss].)

Storebrand argues that the *PECO* court's reliance on "liability insurance" cases renders the decision suspect. We disagree. The *PECO* policy, like Storebrand's policy, was a first party property loss policy, not a third party liability policy. The *PECO* court simply looked, as do we, to liability cases which hold that a series of *related* acts, attributable to a *single* cause, may be treated as having been caused by one occurrence. Storebrand's citation to *Newmont Mines, Ltd.* v. *Hanover Ins. Co., supra,* 784 F.2d at pp. 136-137, does not persuade us otherwise. That case involved the collapse of the roof of separate parts of the same large building on different dates due to the weight of snow and ice. The evidence did not clearly establish that the second collapse had not been caused by an additional separate snowfall.

Thus, the court was able to conclude that these could be found to be separate injuries and the court rejected the insurer's argument that it should only be required to pay a single policy limit. The court approved a jury instruction used by the trial court which stated, in part: "If you find that the collapse of the two sections of the roof was a *single, continuous event or incident,* then the collapse constituted a single occurrence-and there would be only one loss. [¶] If, on the other hand, you find that the collapse of the two sections of the roof constituted separate events or incidents that *were not causally related,* then of course you would have two separate losses." (*Id.* at pp. 134-135, italics added.) We find no inconsistency between this instruction and the conclusion we reach.

Other courts, both in California and across the country, have reached a similar conclusion when faced with a fact situation involving a series of related acts which can be attributed to a single cause; and the same principle is applied whether the coverage involves property, liability or fidelity insurance. (*Haerens* v. *Commercial Cas. Ins. Co.* (1955) 130 Cal.App.2d Supp. 892, 893-894 [279 P.2d 211] [employee's scratching of numerous window panes gives rise to a single deductible, not one per window]; *State Farm Fire & Casualty Co.* v. *Elizabeth N.* (1992) 9 Cal.App.4th 1232, 1237-1238 [12 Cal.Rptr.2d 327] [repeated acts of child abuse resulted from the insured's continuing negligent failure over several months to monitor activities of her pedophile husband, thus triggering the "$100,000 per occurrence" liability limitation]; *Chemstar, Inc.* v. *Liberty Mut. Ins. Co.* (9th Cir. 1994) 41 F.3d 429, 433 [twenty-eight incidents of pitting involving twenty-eight different homes and multiple claimants, but caused by the failure of a lime plaster manufacturer to warn of limited application requirement, thus triggering only one deductible]; *Mead Reinsurance* v. *Granite State Ins. Co.* (9th Cir. 1988) 873 F.2d 1185, 1188 [eleven separate lawsuits alleging excessive force by police were founded upon alleged policy of condoning police brutality and thus constituted a single "occurrence"]; *Appalachian Ins. Co.* v. *Liberty Mut. Ins. Co., supra,* 676 F.2d at p. 61 [insured's pattern of employment discrimination constituted one "occurrence" even though it resulted in multiple claims over extended period of time]; *Associated Indem. Corp.* v. *Dow Chemical Co.* (E.D.Mich. 1993) 814 F.Supp. 613, 623 [damage to different buildings caused by same defect in building material constituted one "occurrence"]; *Transport Ins. Co.* v. *Lee Way Motor Freight* (N.D.Tex. 1980) 487 F.Supp. 1325, 1329 [insured's discriminatory policies constituted one "occurrence" despite insured. operating from four separate trucking terminals]; *Michaels* v. *Mutual Marine Office, Inc.* (S.D.N.Y. 1979) 472 F.Supp. 26, 29 [two hundred dents and holes caused by "grab buckets" dropped over nine-day period constituted one "occurrence"]; *Champion Intern. Corp.* v. *Continental Cas. Co.* (2d Cir. 1976) 546 F.2d 502, 506, cert.

den., 434 U.S. 819 [54 L.Ed.2d 75, 98 S.Ct. 59] [continuous and repeated sale of defective paneling—used in one thousand four hundred vehicles—constituted one "occurrence" even though it resulted in damages to a large number of individual consumers]; *Uniroyal, Inc.* v. *Home Ins. Co.* (E.D.N.Y. 1988) 707 F.Supp. 1368, 1382-1383 [one hundred ten deliveries of Agent Orange herbicides by insured to military constituted one continuous "occurrence"]; *Howard, Weil, Labouisse, Friedrichs* v. *Ins. Co.* (5th Cir. 1977) 557 F.2d 1055, 1059-1060 [a series of trades and bad checks constituted "a single ongoing episode resulting in a single loss" with respect to a broker's blanket bond].)

We are persuaded to adopt and follow the rule announced in *PECO Energy Co.* v. *Boden, supra,* 64 F.3d 852 and in the above cited authorities. Provided that EOTT can establish that there was a systematic and organized scheme to steal its diesel fuel products and that such scheme was the proximate cause of its $1.5 million loss, then there would only be a single occurrence subject to a single deductible of $100,000. Certainly, this record discloses that evidence was presented by EOTT which demonstrates that material issues of fact exist on that point. The trial judge's determination to award summary judgment, even in the presence of an organized and systematic conspiracy, was error.

## Conclusion

The trial court erred in granting summary judgment. The "theft by trickery" exclusion does not apply to this case and EOTT has raised material issues of fact as to whether an organized and systematic scheme existed to steal its diesel fuel products. If EOTT can establish that its loss resulted from the operation of such a scheme, then Storebrand can only assert a single deductible and thus would not be absolved of liability.

## Disposition

The judgment is reversed and remanded for further proceedings not inconsistent with the views expressed herein. EOTT shall recover its costs on appeal.

Klein, P. J., and Kitching, J., concurred.

Respondents' petition for review by the Supreme Court was denied August 14, 1996.