Filed 7/31/13  Cavalier Sportwear v. CastlePoint Nat. Ins. CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| CAVALIER SPORTSWEAR, INC.<br><br>        Plaintiff and Appellant,<br><br>v.<br><br>CASTLEPOINT NATIONAL<br>INSURANCE COMPANY,<br><br>        Defendant and Respondent. | B239695<br>(Los Angeles County<br>Super. Ct. No. BC454684) |

        APPEAL from an order of the Superior Court of Los Angeles, John Segal, Judge.  Affirmed.

        Law Offices of John A. Belcher and John A. Belcher for Plaintiff and Appellant.

        Grant, Genovese & Baratta, James M. Baratta, Lance D. Orloff and Michael S. Frey for Defendant and Respondent.

Appellant Cavalier Sportswear, Inc. (Cavalier) brought suit against CastlePoint National Insurance Company (CastlePoint) as a judgment creditor of CastlePoint's insured, Grumpy Transportation (Grumpy). Cavaliar's judgment against Grumpy was based on Grumpy's failure to safeguard property -- a load of jeans -- it was transporting on Cavalier's behalf, resulting in loss of the property through theft or conversion. CastlePoint obtained summary judgment based on the trial court's conclusion that losses of personal property due to theft or conversion were not covered under either of the insurance policies issued by CastlePoint to Grumpy. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

A. *Cavalier's Complaint*

The complaint alleged that in March 2009, Cavalier, a designer and distributor of fashion apparel, hired Grumpy to transport a shipping container holding 24,000 pairs of jeans from the Port of Long Beach to Cavalier's place of business.[1] Grumpy allegedly "negligently failed to safeguard the container," and as a result, the container and the jeans were stolen by an unknown party.[2]

Cavalier filed suit against Grumpy in October 2009 and obtained a default judgment in the amount of $266,169.12 plus costs.[3] After obtaining the judgment,

---

[1] There is no dispute as to these underlying facts.

[2] Cavalier's October 2009 complaint against Grumpy had alleged claims for breach of contract, negligence, and negligent bailment, based on failing to properly safeguard the goods, failing to properly insure the goods, and leaving the goods in its storage yard rather than immediately delivering them to Cavalier. According to the complaint, "[o]n or about March 9, 2009, [Grumpy] informed [Cavalier] that [the container holding its jeans] had disappeared and had apparently been stolen . . . ."

[3] In its application for default judgment, Cavalier contended that "some unknown individuals broke into [Grumpy's] storage yard with a truck capable of transporting the shipping container, and made off with the container . . . ." The application further alleged
*(Fn. continued on next page.)*

2

Cavalier filed the underlying suit against CastlePoint. The complaint alleged that Grumpy was a named insured under a CastlePoint commercial general liability (CGL) policy (No. 10-ATMTR225GL-01) and a second CastlePoint policy (No. ATMTR000610CA01), referred to by the parties as the "Trucking Policy." Both policies allegedly obligated CastlePoint to "pay on behalf of the insured Grumpy all sums which the insured Grumpy shall become legally obligated to pay as damages because of property damage."[4] According to the complaint, Cavalier delivered a conformed copy of the judgment against Grumpy to CastlePoint, who "failed and refused, and continue to fail and refuse, to pay the judgment or any portion of it." Cavalier contended that Insurance Code section 11580 permitted a judgment creditor of Grumpy's to bring a direct action against CastlePoint.[5]

---

that Grumpy "failed to assure full insurance coverage for all goods, including goods no longer in transit or in temporary storage"; "failed to insure its yard facilities for theft of customer's goods"; and "moved the container without maintaining yard insurance, in violation of business custom and practice and the agreement with [Cavalier]."

[4] The complaint further alleged that Grumpy was covered by a liability insurance policy issued by Hartford Fire Insurance Company, who is not a party to this proceeding.

[5] Insurance Code section 11580 provides that with very limited exceptions, policies insuring against loss or damage resulting from "liability for injury suffered by another person" and policies insuring against loss or damage to property caused by "any vehicle" or a "draught animal[]" must include "[a] provision that whenever judgment is secured against the insured or the executor or administrator of a deceased insured in an action based upon bodily injury, death, or property damage, then an action may be brought against the insurer on the policy and subject to its terms and limitations, by such judgment creditor to recover on the judgment." Where a policy provision is mandated by statute, policies are enforced as if they contain the required provision. (Croskey et al., Cal. Practice Guide: Insurance Litigation (The Rutter Group 2004) ¶3:18, p. 3-4 (rev. #1, 2010).)

3

B.  *CastlePoint's Motion for Summary Judgment*

CastlePoint moved for summary judgment, responding to the allegations of the complaint that the CGL Policy and/or the Trucking Policy obligated CastlePoint to "pay on behalf of the insured Grumpy all sums which the insured Grumpy shall become legally obligated to pay as damages because of property damage."  According to the moving papers and the policies attached as exhibits, the CGL policy provided liability coverage for sums "the insured becomes legally obligated to pay" as the result of "'property damage'" caused by an "'occurrence,'" defined generally as an "accident."[6]  Section II of the Trucking Policy, entitled "Liability Coverage," stated that CastlePoint would "pay all sums the 'insured' legally must pay as damages because of . . . 'property damage' . . . caused by an 'accident' and resulting from the ownership, maintenance or use of a covered 'auto.'"[7]  The CGL Policy defined property damage as (1) "[p]hysical injury to tangible property, including all resulting loss of use of that property" and (2) "[l]oss of use of tangible property that is not physically injured."  Section II of the Trucking Policy similarly defined property damage as "damage to or loss of use of tangible property."  Based on these provisions, CastlePoint argued that neither policy provided coverage for the stolen jeans because under settled law, theft or conversion is not "[p]hysical injury" to or "loss of use" of tangible property.

---

[6]     As explained in *A.C. Label Co. v. Transamerica Ins. Co.* (1996) 48 Cal.App.4th 1188, 1192, "CGL policies are third party liability insurance policies which obligate insurers to pay money to third parties to whom their insureds are liable" and are distinguishable from first party insurance policies "which obligate an insurer to pay money directly to an insured for a loss sustained by the insured as a result of a particular covered peril . . . ."

[7]     "'Auto'" was defined to include "[a] land motor vehicle, 'trailer' or semitrailer designed for travel on public roads . . . ."

CastlePoint further contended that even if either policy's coverage provisions could be read to include the loss suffered by Cavalier, CastlePoint's obligation to pay was precluded by the exclusions applicable to the CGL Policy and section II of the Trucking Policy. The CGL Policy excluded "[p]ersonal property in the care, custody or control of the insured." Section II of the Trucking Policy similarly excluded from coverage "'[p]roperty damage' to or . . . involving property . . . transported by the 'insured' or in the 'insured's' care, custody or control."

In its opposition, Cavalier focused on the comprehensive coverage provisions of the Trucking Policy found in sections III and IV.[8] Section III, entitled "Trailer Interchange Coverage," provided that CastlePoint would pay "all sums you [the insured] legally must pay as damages because of 'loss' to a 'trailer' you don't own or its equipment . . . [f]rom any cause" except collision or overturn (which were covered under separate collision provisions); section IV, entitled "Physical Damage Coverage," provided that CastlePoint would pay "for 'loss' to a

---

[8]    As explained in Appleman's treatise on insurance, vehicular policies generally contain multiple parts, one providing third party liability insurance "protecting the insured from liability to third parties for bodily injury and property damage claims," and others providing coverage for physical damage to the vehicle, "protect[ing] the insured against accidental damage to or loss of a motor vehicle caused by a variety of perils." (6 New Appleman on Insurance Law, Library edition (Thomas ed. 2012) §§ 62.01[1], 63.01[1], pp. 62-8-62-9, 63-9.) Physical damage coverage is further divided between "collision" insurance and "comprehensive" insurance. (*Id*., p. 62-9; see Croskey, *supra*, 6:2000, p. 6G-1 (rev. #1, 2010).) Collision insurance generally protects against "upset of the insured vehicle, impact of the insured vehicle with another vehicle, or impact of the insured vehicle with another object." (Appleman, *supra*, § 62.02, pp. 62-18-62-19; see Croskey, *supra*, ¶ 6:2021, p. 6G-3 (rev. #1, 2010).) Comprehensive insurance generally provides coverage for direct accidental loss to the covered vehicle by causes other than upset or collision, and generally includes protection against the peril of theft. (Appleman, *supra*, §§ 62.03[1], [2] & [4][c], pp. 62-30, 62-31-62-32, 62-37-62-38; see Croskey, *supra*, ¶ 6:2043, p. 6G-8 (rev. #1, 2010).)

covered 'auto' or its equipment . . . [f]rom any cause."[9] Subpart b of both provisions specified the types of losses covered, and included losses caused by "[t]heft."

Cavalier also relied on language found in subsection III.C and subsection IV.C. The former provision, entitled "Limit of Insurance And Deductible," stated that "for 'loss' to any one 'trailer'" CastlePoint would pay the lesser of "[t]he actual cash value of the damaged or stolen property at the time of the 'loss'" or "[t]he cost of repairing of replacing the damaged or stolen property with other property of like kind and quality" up to the limits of insurance shown in the declarations. The latter provision, entitled "Limits of Insurance," similarly provided that "for 'loss' in any one 'accident,'" CastlePoint would pay the lesser of "[t]he actual cash value of the damaged or stolen property as of the time of 'loss'" or "the cost of repairing or replacing the damaged or stolen property with other property of like kind and quality." Based on these provisions, Cavalier contended that the Trucking Policy provided coverage for loss from "'any cause,'" including any type of "'stolen property.'"[10]

Cavalier raised several alternative contentions in its opposition. First, it disputed that the loss of its jeans was not a covered risk under the CGL Policy, essentially contending the loss constituted "property damage" caused by Grumpy's negligence. Second, Cavalier presented evidence that in rejecting Cavalier's

---

[9]    As previously stated, "'[a]uto'" was defined by the Trucking Policy to include a "'trailer' or semi trailer designed for travel on public roads . . . ." The policy's definition of the term "trailer" further provided that for purposes of Trailer Interchange Coverage only, "'trailer' also includes a container."

[10]    Cavalier did not specifically contend the language created an ambiguity as to the scope of the coverage provisions of the Trucking Policy. At the hearing, Cavalier's counsel asserted that the term "stolen property" was not defined in the policy and that the insured could have reasonably believed it included the contents of a shipping container.

6

prelitigation demand, CastlePoint had not analyzed the potential for coverage under the CGL Policy, but had limited its analysis to the potential for coverage under section II of the Trucking Policy, suggesting that CastlePoint had thereby engaged in bad faith. Third, Cavalier contended that it was an "'additional insured'" under the CGL Policy.[11] Finally, Cavalier contended that the motion for summary judgment should be denied because CastlePoint failed to include any of the pertinent policy language in its separate statement of undisputed facts.

In its reply, CastlePoint pointed out that Cavalier had alleged in its complaint that it sought recovery for "property damage" and based its claim on Insurance Code section 11580, subdivision (b)(2), which permits a nonparty to the insurance contract to sue the insurer directly after obtaining judgment against the insured for "bodily injury, death, or property damage." Thus, the complaint did not assert a claim under the sections of the Trucking Policy cited in Cavalier's opposition. Moreover, the provisions of sections III and IV of the Trucking Policy discussed in the opposition provided coverage only for loss of or damage to covered autos, trailers and containers -- not their contents. In any event, CastlePoint argued, both the Trucking Policy and the CGL policy excluded damage to personal property in the care, custody or control of Grumpy. Finally, CastlePoint noted that Cavalier's complaint had not alleged a bad faith claim based on CastlePoint's claims handling or investigation procedures, and had not alleged that Cavalier was an additional insured under any policy.

The trial court granted summary judgment. In its written order, the court stated: "The provisions on which [Cavalier] relies do not apply. [Section III of the Trucking Policy] applies to a loss of a trailer and containers. [Citation.] [Section

---

[11]     Cavalier relied on an endorsement to the CGL Policy adding as an "[a]dditional [i]nsured," "any as required by written contract or agreement."

7

IV of the Trucking Policy] applies to autos, and not even containers.  [Citation.]
Thus, this coverage is for loss of trucks and containers and not for stolen property
liabilities Grumpy . . . may become legally obligated to pay."  Judgment was
entered and this appeal followed.


**DISCUSSION**

A.  *Scope of Review*

A defendant moving for summary judgment "bears the burden of persuasion
that there is no triable issue of material fact and that [the defendant] is entitled to
judgment as a matter of law."  (*Aguilar v. Atlantic Richfield Co*. (2001) 25 Cal.4th
826, 850.)  To meet this burden, the defendant must show one or more elements of
the cause of action cannot be established, or that there is a complete defense to that
cause of action.  (*Ibid*.; *Millard v. Biosources, Inc*. (2007) 156 Cal.App.4th 1338,
1345.)  "'The burden of a defendant moving for summary judgment only requires
that he or she negate plaintiff's theories of liability as alleged in the complaint. . . .
"'. . .  The [papers] filed in response to a defendant's motion for summary
judgment may not create issues outside the pleadings and are not a substitute for an
amendment to the pleadings.'""'"  (*Millard v. Biosources, Inc*., *supra*, at p. 1353,
italics omitted, quoting *Tsemetzin v. Coast Federal Savings & Loan Assn*. (1997)
57 Cal.App.4th 1334, 1342.)

"[A]fter a motion for summary judgment has been granted [by a trial court],
[an appellate court] review[s] the record de novo, considering all the evidence set
forth in the moving and opposition papers except that to which objections have
been made and sustained.  [Citation.]"  (*Guz v. Bechtel National, Inc*. (2000) 24
Cal.4th 317, 334.)  "In reviewing a ruling on a motion for summary judgment, an
appellate court (1) 'identif[ies] the issues framed by the pleadings,' (2)
'determine[s] whether the moving party's showing has established facts which

8

negate the opponent's claim and justify a judgment in movant's favor,' and (3) '[w]hen a summary judgment motion prima facie justifies a judgment, . . . determine[s] whether the opposition demonstrates the existence of a triable, material factual issue.'" (*Turner v. Anheuser-Busch, Inc*. (1994) 7 Cal.4th 1238, 1252-1253.)

Cavalier's complaint was based on its contention that Grumpy's conduct caused "property damage" to Cavalier's property within the meaning of Insurance Code section 11580. Section 11580 permits a judgment creditor to bring an action directly against the judgment debtor's insurer "to recover on the judgment," when the creditor's judgment was obtained "in an action based on bodily injury, death, or property damage . . . ." (*Howard v. American National Fire Ins. Co*. (2010) 187 Cal.App.4th 498, 513.) Any such claim is "subject to the policy's terms and limitations . . . ." (*Ibid*.; *Shafer v. Berger, Kahn, Shafton, Moss, Figler, Simon & Gladstone* (2003) 107 Cal.App.4th 54, 68.) In order to recover in an action under Insurance Code section 11580, claimants are required to plead and prove: "'[They] obtained a judgment for bodily injury, death, or property damage'"; "'the judgment was against a person insured under a policy that insures against loss or damage resulting from liability for personal injury or insures against loss of or damage to property caused by a vehicle or draught animal'"; and "'the policy covers the relief awarded in the judgment.'" (*Garamendi v. Golden Eagle Ins. Co*. (2004) 116 Cal.App.4th 694, 710.) Accordingly, we review the terms of each policy to determine whether it provided coverage for the loss suffered by Cavalier as asserted in the complaint.

B.  *Cavalier's Loss Was Not Covered By The CGL Policy*

In interpreting an insurance policy we follow certain principles. "An insurance policy is written in two parts: the insuring agreement defin[ing] the type

9

of risks which are covered," and the exclusions, which "remove coverage for certain risks which are initially within the insuring clause." (*Collin v. American Empire Ins. Co*. (1994) 21 Cal.App.4th 787, 802, 803 (*Collin*).) A court first "'examine[s] the coverage provisions to determine whether a claim falls within the potential ambit of the insurance.'" (*Id*. at p. 803, quoting *Hallmark Ins. Co. v. Superior Court* (1988) 201 Cal.App.3d 1014, 1017.) The burden is on "the insured to bring the claim within the basic scope of coverage, and . . . courts will not indulge in a forced construction of the policy's insuring clause to bring a claim within the policy's coverage." (*Collin*, *supra*, at p. 803.) "Once the insured has made that showing, the burden is on the insurer to prove the claim is specifically excluded." (*MRI Healthcare Center of Glendale, Inc. v. State Farm General Ins. Co*. (2010) 187 Cal.App.4th 766, 777.) "While insurance contracts have special features, they are still contracts to which the ordinary rules of contractual interpretation apply. [Citation.] . . . If contractual language is clear and explicit, it governs." (*Bank of the West v. Superior Court* (1992) 2 Cal.4th 1254, 1264.) "We interpret words in accordance with their ordinary and popular sense, unless the words are used in a technical sense or a special meaning is given to them by usage." (*Kaiser Cement & Gypsum Corp. v. Insurance Co. of Pennsylvania* (2013) 215 Cal.App.4th 210, 226.)

The CGL Policy's coverage provision stated that CastlePoint would pay for "those sums that [Grumpy] becomes legally obligated to pay as damages because of . . . 'property damage,'" defined as "physical injury to tangible property" or "[l]oss of use of tangible property that is not physically injured," if such property damage was "caused by an 'occurrence,'" defined generally as "an accident." The law in this area is settled: "Virtually every court [to have interpreted similar provisions] has agreed that 'conversion' of property is not 'property damage.'" (*Collin*, *supra*, 21 Cal.App.4th at p. 816.) The reason is simple: under the plain

10

meaning of the words, "'[t]here is a material difference between "property taken" and "property damaged."'" (*Id.* at p. 817, quoting *Nortex Oil & Gas Corp. v. Harbor Insurance Co.* (Tex.Civ.App. 1970) 456 S.W.2d 489, 493.) Moreover, "'[l]oss of use' of property is different from 'loss' of property," and if an insured wishes to insure against "'loss' of property," it should obtain a policy that so provides. (*Collin, supra*, at pp. 818-819; accord, *Criticom Internat. Corp. v. Scottsdale Ins. Co.* (9th Cir. 2007) 228 Fed.Appx. 677, 678 [distinguishing conversion from "'[p]hysical injury to tangible property'" and "'[l]oss of use'"]; see also 2 Witkin, Summary of Cal. Law (10th ed. 2005) Insurance, § 98, p. 154 ["[C]onversion is not property damage, but rather the taking or deprivation of property."]; *MRI Healthcare Center of Glendale, Inc. v. State Farm General Ins. Co., supra*, 187 Cal.App.4th at p. 780, italics omitted [for "'direct physical loss'" to occur, "some external force must have acted upon the insured property to cause a physical change in the condition of the property"].)

Most recently, the issue was addressed in *Advanced Network, Inc. v. Peerless Ins. Co.* (2010) 190 Cal.App.4th 1054, where the insured's employee stole cash from one of its clients while servicing the client's ATM's. The trial court found the loss covered by the insured's CGL policy -- a policy similar to the one at issue here -- reasoning that "cash is tangible property," that "there was an 'occurrence' because from the standpoint of [the insured], its employee's theft of cash was unforeseen and unintended," and that the client "'did sustain a "loss of use" of the bills.'" (*Advanced Network, Inc. v. Peerless Ins. Co., supra,* at p. 1059.) The Court of Appeal reversed, basing its decision on the plain meaning of the terms of the policy: "[T]he terms 'loss of use' and 'loss' are not interchangeable for insurance purposes. If we were to hold otherwise, we would have to ignore the words 'of use' in the term 'loss of use.' 'We must give significance to every word of a contract, when possible, and avoid an interpretation

11

that renders a word surplusage.' [Citation.] Further, '[c]ourts do not engage in forced construction of insuring clauses to find coverage, nor will they strain to create an ambiguity where none exists.' [Citation.] Coverage for 'loss of use' does not apply to an underlying action in which the claimant seeks only the replacement value of converted property." (*Id*. at pp. 1063-1064.)

Under the analysis of *Collin* and *Advanced Network, Inc. v. Peerless Ins. Co.,* Cavalier's property was not "damaged" by an "occurrence" within the meaning of the CGL Policy. The jeans were not "physically injured." Nor did Cavalier suffer a "loss of use." The jeans were deliberately stolen from Grumpy's storage yard by an unknown party. The loss may have been the result of Grumpy's negligence, but not every loss caused by the insured must be indemnified -- only those that fall under the policy's coverage provisions. In sum, the theft of Cavalier's jeans from Grumpy's custody did not constitute 'property damage' covered by the CGL policy.[12]

C. *Cavalier's Loss Was Not Covered By Section II Of The Trucking Policy*

Similarly to the CGL Policy, section II of the Trucking Policy, entitled "Liability Coverage," provided coverage for "all sums an 'insured' legally must pay as damages because of . . . 'property damage' . . . caused by an 'accident . . . .'" Section II of the Trucking Policy also contained a similar exclusion, eliminating from coverage "'[p]roperty damage' to or . . . involving property

---

[12]     Because Cavalier's claim does not fall within the potential coverage of the insurance policy, there is no obligation to analyze whether any of the exclusions apply. However, the exclusion from coverage under the CGL Policy of "[p]ersonal property in the care, custody or control of the insured" provides further support for CastlePoint's contention that the loss was not covered under this policy. Cavalier's jeans were personal property in the care, custody and control of Grumpy at the time of the loss, and thus, even if otherwise covered, clearly fall within this exclusionary provision.

owned or transported by the 'insured' or in the 'insured's' care, custody or control." Accordingly, any contention that the loss of the jeans was covered by section II of the Trucking Policy is foreclosed for the reasons stated above. Moreover, coverage under section II of the Trucking Policy existed only where the accident that damaged the property "result[ed] from the ownership, maintenance or use of covered 'auto[s]'" or "'trailer[s].'" According to the complaint, Cavalier's jeans were stolen from Grumpy's storage yard, not damaged from, or in connection with, the ownership, maintenance, or use of a covered auto or trailer. Accordingly, Cavalier failed to establish essential elements of its claim under Insurance Code section 11580; namely, that it obtained a judgment for "bodily injury, death, or property damage," or that the policy covered the relief awarded in the judgment. Cavalier's moving papers thus established entitlement to summary judgment on the claims asserted in the complaint.

D. *Cavalier's Loss Was Not Covered By Sections III Or IV Of The Trucking Policy*

As it did in its opposition to the summary judgment motion, on appeal Cavalier attempts to shift the focus from the CGL Policy and section II of the Trucking Policy to the portions of the Trucking Policy providing comprehensive coverage -- "Section III - Trailer Interchange Coverage" and "Section IV - Physical Damage Coverage." Section III promises that CastlePoint will "pay all sums you [the insured] legally must pay as damage because of 'loss' to a 'trailer' you don't own or its equipment . . . ." In section IV, CastlePoint agreed to pay for "'loss' to a covered 'auto' or its equipment . . . ."

Preliminarily, we observe that no claim for coverage under sections III or IV of the Trucking Policy -- comprehensive coverage provisions -- was asserted in the complaint. Cavalier alleged that CastlePoint's liability to Cavalier arose out of

13

CastlePoint's agreement in the CGL Policy and section II of the Trucking Policy "to pay on behalf of the insured Grumpy all sums which the insured Grumpy shall become legally obligated to pay as damages because of property damage." Once a defendant has negated the theories of the complaint, as CastlePoint did here, a plaintiff may not create new issues to avoid summary judgment unless the complaint is amended. (*Millard v. Biosources, Inc.*, *supra*, 156 Cal.App.4th at p. 1353.) Cavalier did not seek to amend its complaint to assert a claim under sections III or IV of the Trucking Policy or any other potential theft insurance.

In any event, the claims fail on the merits. Section IV provides typical first party comprehensive coverage for physical damage to vehicles owned by the insured.[13] The truck and trailers covered are listed in the policy's schedule "of covered autos you own." The stolen jeans are not "covered autos." Cavalier is not a named insured under this section and is not seeking recovery for damage to or theft of a covered "auto."

Section III provides a form of third party liability coverage, obligating CastlePoint to pay all sums Grumpy must legally pay "as damages because of a 'loss,'" but it is expressly limited to damages paid because of "'loss' to a 'trailer' . . . or its equipment . . . ." The definition of "trailer" is extended for this section to include "container[s]," but nothing in the policy indicates that the contents of

---

[13] As explained in *Montrose Chemical Corp. v. Admiral Ins. Co.* (1995) 10 Cal.4th 645, 663, "a first party insurance policy provides coverage for loss or damage sustained directly by the insured (e.g., life, disability, health, fire, theft and casualty insurance). A third party liability policy, in contrast, provides coverage for liability of the insured to a 'third party' (e.g., a CGL policy, a directors and officers liability policy, or an errors and omissions policy). In the usual first party policy, the insurer promises to pay money to the insured upon the happening of an event, the risk of which has been insured against. In the typical third party liability policy, the carrier assumes a contractual duty to pay judgments the insured becomes legally obligated to pay as damages because of bodily injury or property damage caused by the insured."

14

containers are covered. Unless expressly provided for, purely personal property located within a covered motor vehicle is not insured against risk of loss under the policy which protects the vehicle against physical damage or theft. (11 Couch on Insurance (3d ed. 2005) §§ 156:16-156:17, pp. 156-30-156-31; compare *Continental Electric. Co. v. American Emp. Ins. Co*. (Ala. 1987) 518 So.2d 83, 85-86 [commercial automobile insurance policy obligating insurer to pay for damage to covered auto or its equipment did not extend to display samples being transported in covered trailer] with *State Farm Mut. Auto Ins. Co. v. McInnish* (Ala. 1969) 226 So.2d 149, 150 [contents of automobile covered where policy expressly stated insurer would pay for loss "to wearing apparel and luggage owned by [the insured, spouse or relatives while residents of the same household], while such property is in or upon the owned automobile"].)

Cavalier attempts to convince us otherwise by repeatedly referring to sections III and IV of the Trucking Policy as "all risk" coverage, and citing cases in which courts found that theft of personal property was covered under various types of policies and circumstances.[14] Calling a policy "all risk" does not resolve

---

[14] None of the cases Cavalier cites involved a comprehensive or physical damage policy for a motor vehicle, and none of the policies at issue contained language similar to the coverage provisions of the Trucking Policy. In *Pasternak v. Boutris* (2002) 99 Cal.App.4th 907, the defendant, a nonprofit mutual benefit corporation, promised to provide indemnity to its members against monetary losses resulting from "'the fraudulent or dishonest abstraction, misappropriation, or embezzlement of trust obligation by an officer, director, trustee, stockholder, manager, or employee of a member.'" (*Id*. at p. 913.) *EOTT Energy Corp. v. Storebrand Internat. Ins. Co*. (1996) 45 Cal.App.4th 565, involved a property insurance policy providing first party coverage to the insured against "'all risks of direct physical loss or damage occurring during the [policy period] from any external cause [except as specifically excluded],'" including theft. (*Id*. at p. 569.) *EMMI Inc. v. Zurich American Ins. Co*. (2004) 32 Cal.4th 465, involved a "jewelers' block" insurance policy providing first party coverage for all risks of loss or damage to jewelry subject to certain exceptions, one of which was theft from a vehicle where the insured or

*(Fn. continued on next page.)*

15

whether a particular loss is covered. Regardless of how a policy is characterized, the interpretation of its provisions to determine the extent of coverage is made under the well-settled rules of contract interpretation set forth above, including the rule that "[t]he 'clear and explicit' meaning of [the coverage provisions] interpreted in their 'ordinary and popular sense'" controls, "unless 'used by the parties in a technical sense or a special meaning is given to them by usage . . . .'" (*EMMI Inc. v. Zurich American Ins. Co.*, *supra*, 32 Cal.4th at pp. 470-471; see *EOTT Energy Corp. v. Storebrand Internat. Ins. Co.*, *supra*, 45 Cal.App.4th at p. 574.) The coverage provisions of sections III and IV at issue here limit coverage to losses to a trailer the insured does not own or its equipment and losses to a covered auto or trailer the insured does own or its equipment. Nothing in these provisions suggest that the contents of trailers or autos is included.

Cavalier selectively quotes provisions of sections III and IV of the Trucking Policy that specify the "Limits of Insurance" available and a provision of section V that discusses CastlePoint's options with respect to the "Loss Payment" for "Physical Damage Coverages." In the quoted provisions, the policy states that the most CastlePoint will pay for "'loss' to any one 'trailer'" or "'loss' in any one 'accident'" is "the actual cash value of the damaged or stolen property at the time of the 'loss'" or "[t]he cost or repairing of replacing the damaged or stolen property with other property of like kind and quality," and further provides that CastlePoint has the option of "[p]ay[ing] for, repair[ing][ or replac[ing] damaged or stolen property," "[r]eturn[ing] the stolen property," or "[t]ak[ing] all or any part of the damaged or stolen property at an agreed or appraised value." Without specifically so stating, Cavalier appears to suggest that these references to "stolen

---

a designated employee was not "'actually in or upon'" the vehicle at the time of the theft. (*Id.* at pp. 469-470.)

16

property" create an ambiguity concerning the intent to provide coverage for stolen cargo.

As explained in *Bank of the West v. Superior Court*, "a court that is faced with an argument for coverage based on assertedly ambiguous policy language must first attempt to determine whether coverage is consistent with the insured's objectively reasonable expectations. In so doing, the court must interpret the language in context, with regard to its intended function in the policy. [Citation.] . . . . '[L]anguage in a contract must be construed in the context of that instrument as a whole, and in the circumstances of that case, and cannot be found to be ambiguous in the abstract.'" (*Bank of the West v. Superior Court, supra*, 2 Cal.4th at p. 1265, italics omitted, quoting *Producers Dairy Delivery Co. v. Sentry Ins. Co.* (1986) 41 Cal.3d 903, 916, fn. 7.) "Only if these rules do not resolve a claimed ambiguity do we resort to the rule that ambiguities are to be resolved against the insurer. [Citation.]" (*Boghos v. Certain Underwriters at Lloyd's of London* (2005) 36 Cal.4th 495, 501.) We will not indulge in a "forced construction" to bring a claim within the policy's coverage. (*Collin*, *supra*, 21 Cal.App.4th at p. 803.)

The coverage provisions of section III and IV of the Trucking Policy clearly state that coverage applies to "autos," "trailers," defined to include "containers" for purposes of section III, and their "equipment." These provisions are not ambiguous and cannot reasonably be interpreted to include the contents of containers or cargo transported by Grumpy. Read in context, the references to "stolen property" in the provisions Cavalier quotes in its brief can be read only as references to the property described in the coverage provisions -- trailers, containers, autos, and their equipment. We conclude, therefore, that even if the complaint could be so broadly read as to assert liability under sections III and IV of the Trucking Policy, such claim would be defeated by the plain terms of the Trucking Policy.

17

E.  *CastlePoint's Failure To Analyze Coverage Under The CGL Policy When Presented With Cavalier's Claim Did Not Provide A Basis For Bad Faith Liability*

Cavalier contends that CastlePoint engaged in bad faith by failing to analyze coverage under the CGL Policy or sections III and IV of the Trucking Policy prior to rejecting Cavalier's pre-litigation claim.  An insurer owes a duty under the implied covenant of good faith and fair dealing "not to withhold in bad faith payment of damages which the insured has become obligated by judgment to pay," and courts have held that a third party judgment creditor becomes a third party beneficiary to the insurance contract entitled to recover tort damages if the insurer refuses to pay the claim in bad faith.  (*Hand v. Farmers Ins. Exchange* (1994) 23 Cal.App.4th 1847, 1857-1860; accord, *Low v. Golden Eagle Ins. Co.* (2002) 101 Cal.App.4th 1354, 1368; but see *Hughes v. Mid-Century Ins. Co.* (1995) 38 Cal.App.4th 1176, 1184 [discussing whether *Hand* should be viewed "as improperly extending the law of tortious bad faith" to third party claimants].)  However, Cavalier asserted no claim for bad faith in its complaint and as noted, it may not initiate a new claim without amending its complaint.  (*Millard v. Biosources, Inc.*, *supra*, 156 Cal.App.4th at p. 1353.)  Moreover, an insurer cannot be liable for bad faith if its coverage decision under the applicable polices is subsequently determined to be objectively reasonable.  (*CalFarm Ins. Co. v. Krusiewicz* (2005) 131 Cal.App.4th 273, 277.)  For the reasons discussed, CastlePoint's decision that it was not liable for payment of the judgment debt Grumpy owed Cavalier was objectively reasonable.

18

F.  *Cavalier Has Forfeited Any Contention of Liability Based On Its Alleged Status As Insured Under The CGL Policy*

Cavalier claims to be an additional insured under the CGL Policy.  However, its brief contains no analysis of the policy or the applicable law to suggest how its alleged status creates an obligation on the part of CastlePoint to pay the judgment debt.  Where, as here, "an appellant fails to raise a point, or asserts it but fails to support it with reasoned argument and citations to authority," we treat the point as waived or forfeited.  (*Badie v. Bank of America* (1998) 67 Cal.App.4th 779, 784-785; accord, *Nelson v. Avondale Homeowners Assn.* (2009) 172 Cal.App.4th 857, 862.)

G.  *CastlePoint's Failure to Include Pertinent Policy Language in Its Statement of Undisputed Facts Provides No Ground for Reversal*

Citing *Haney v. Aramark Uniform Services, Inc*. (2004) 121 Cal.App.4th 623, Cavalier contends CastlePoint's motion for summary judgment was defective because it did not include all pertinent provisions of the policies in its separate statement of material facts.  The court in *Haney* advocated denial of summary judgment where the moving party failed to include all material facts in its separate statement, asserting that "[Code of Civil Procedure] section 437c is a complicated, unforgiving statute with little flexibility and 'myriad requirements.'"  (121 Cal.App.4th at p. 632.)  However, whether to consider evidence submitted by the moving party but not referenced in the party's separate statement rests with the sound discretion of the trial court.  (See, e.g., *King v. United Parcel Service, Inc.* (2007) 152 Cal.App.4th 426, 438; *Zimmerman, Rosenfeld, Gersh & Leeds LLP v. Larson* (2005) 131 Cal.App.4th 1466, 1478; *San Diego Watercrafts, Inc. v. Wells Fargo Bank* (2002) 102 Cal.App.4th 308, 315, 316.)  Here, CastlePoint submitted the relevant insurance policies and quoted the essential portions of the pertinent

language on which it relied in its memorandum of points and authorities. Cavalier has identified no fault in the court's analysis nor any prejudice that resulted from CastlePoint's technical breach. Under these circumstances, the court did not abuse its discretion in considering all the pertinent language of the relevant policies in granting summary judgment.

**DISPOSITION**

The judgment is affirmed.  CastlePoint is awarded its costs on appeal.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


MANELLA, J.


We concur:



WILLHITE, Acting P. J.



SUZUKAWA, J.